**PACIFICORP, doing business as Pacific Power & Light Company, an Oregon corporation, Plaintiff,**

v.

**PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation; Columbia Steel Casting Co., Inc., an Oregon corporation; and Public Utility Commission of Oregon, Defendants.**

**COLUMBIA STEEL CASTING CO., INC., an Oregon corporation, Plaintiff,**

v.

**PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation; Pacificorp, doing business as Pacific Power & Light Company; Myron B. Katz, Nancy Ryles, and Ronald Eachus, Defendants.**

Civ. Nos. 90–524–FR, 90–592–FR.

United States District Court, D. Oregon.

July 3, 1991.

Jeffrey Michael Alden, George M. Galloway, Katherine A. McDowell, Stoel Rives Boley Jones & Grey, Portland, Or., for Pacificorp, dba Pacific Power & Light Co.

William F. Martson, Jr., Barbee B. Lyon, Jeanne M. Chamberlain, Tonkon, Torp, Galen, Marmaduke & Booth, Ann L. Fisher, Portland General Elec. Co., Portland, Or., for Portland General Elec. Co.

Michael C. Dotten, Eric R. Todderud, Heller, Ehrman, White & McAuliffe, Portland, Or., Thomas J. Brewer, Heller, Ehrman, White & McAuliffe, Seattle, Wash., for Columbia Steel Casting Co., Inc.

Dave Frohnmayer, Atty. Gen., Paul A. Graham, Asst. Atty. Gen., Salem, Or., for Public Utility Com'n of Oregon, Myron B. Katz, Nancy Ryles and Ronald Eachus.

## OPINION

FRYE, District Judge:

The following matters are before the court:

1) the motion for partial summary judgment of Columbia Steel Casting Co., Inc. (Columbia) (# 72); and

2) the cross-motion for summary judgment of Portland General Electric Company (PGE) (# 82).

## UNDISPUTED FACTS

On July 18, 1972, PGE and Pacific Power & Light Company (Pacific) entered into an agreement to exchange electric distribution properties and customer accounts in certain defined areas within and around the City of Portland (the 1972 Agreement). The 1972 Agreement provides, in part:

NOW, THEREFORE, in order to implement the elimination of said duplicat-

ing facilities and to comply with Ordinance 134416, it is agreed:

1. *Exchange of Facilities*

(a) Pacific shall transfer and convey to Portland General and Portland General shall acquire from Pacific all of the electric distribution plant, including distribution substations, poles, lines, transformers, meters, related distribution facilities, and all easements necessary for the operation thereof, owned, operated and maintained by Pacific in the area designated as Pacific's Rainier service district, shown on Exhibit A and described in Exhibit C, and in the area designated as Parcel C, shown on Exhibit A and described in Exhibit B; excluding, however: (1) facilities owned, operated and maintained by Pacific within an area commonly known as the Portland downtown core area, designated as Parcel D on Exhibit A, and described in Exhibit B, and (2) certain duct lines owned, operated and maintained by Pacific extending from Pacific's Albina substation to Pacific's facilities within the Portland downtown core area. Distribution substations to be conveyed by Pacific to Portland General are listed in "Exhibit D," attached hereto and made a part hereof.

(b) Portland General shall transfer and convey to Pacific and Pacific shall acquire from Portland General all of the electric distribution plant, including distribution substations, poles, lines, transformers, meters, related distribution facilities, and all easements necessary for the operation thereof, owned, operated and maintained by Portland General in the areas designated as Parcels A and B, shown on Exhibit A and described in Exhibit B; excluding, however: (1) facilities described under the streetlight plant account of the Uniform Systems of Account, except that leased area lights will be conveyed by Portland General to Pacific; (2) certain duct lines owned, operated and maintained by Portland General extending from Portland General's Station L to Portland General's facilities within the Portland downtown core area; and (3) standard wood poles used exclusively for street lighting.

Distribution substations to be conveyed by Portland General to Pacific are listed in Exhibit D.

. . . .

7. *Transfer of Customer Accounts*

The transfer of customer accounts between Portland General and Pacific shall commence on July 24, 1972, and shall be coordinated so that the revenues from the sales of electricity of each company will remain substantially the same over the period required to accomplish transfer of all customers involved. At the time of such transfer, each party shall make available to the other a list of the transferred customers, together with accounting, billing, service and historical sales records relating thereto. On the date of the transfer of customer accounts, each party will render a final bill to those customers being transferred to the other party. Accounts receivable will be retained by the party issuing the final bill.

Exhibit K to Affidavit of L. Guy Marshall (Marshall Affidavit), pp. 2–3, 9.

The City of Portland had consented to the agreed exchange in Ordinance 134416 enacted on April 26, 1972, which states, in part:

An Ordinance consenting to exchange of certain property within the City between Portland General Electric Company and Pacific Power & Light Company on certain conditions in order to permit reduction of poles and wires and duplication of facilities in various areas of the City.

The City of Portland ordains:

Section 1. The Council finds that both Portland General Electric Company and Pacific Power & Light Company operate electric power systems which serve patrons within the City, that both companies operate under non-exclusive franchises and that the obligation to supply properties within the City must remain binding upon both companies; that at the present time, however, in many areas of the City poles and wires are duplicated between the companies for service purposes which results in some areas in

doubling the number of such poles and wires and appurtenances causing interference with view and some additional safety hazards which may result from accidental breakage of such wires or poles, and additional investment which increases the rate bases upon which said companies are entitled to earn a profit; that to reduce the visual impact of duplicating facilities, to promote safety, to promote economy, to simplify subsequent undergrounding and to work toward the lowest possible rates for users within the City, an interchange of properties between the companies should be permitted as hereinafter set forth ... now, therefore, the City does by this ordinance consent to the sale, transfer and exchange of plant and property between Portland General Electric Company and Pacific Power & Light Company as follows.

Exhibit J to Marshall Affidavit, p. 1.

By Order # 72–870 entered on December 15, 1972, the Public Utilities Commission (the PUC) concluded that:

[T]he application of Pacific Power & Light Company and Portland General Electric Company should be granted and an order entered approving the transfer of certain exclusively served territory in the Rainier area from Pacific Power & Light Company to Portland General Electric Company and approving the transfer and exchanging of utility property and facilities and customers between the two companies as applied for. It is therefore

ORDERED that the application of Pacific Power & Light Company to transfer certain of its exclusively served area allocated to it and lying in and around Rainier, Oregon, to Portland General Electric Company is approved. Such assigned area is described as Parcel A in Appendix "A," attached hereto and made a part hereof; it is further

ORDERED that Pacific Power & Light Company may transfer to Portland General Electric Company all electric distribution plant, including distribution substations, poles, lines, transformers, meters, related distribution facilities situated within or used for providing utility service within the boundaries of Parcel A

described in Appendix "A," and within the boundaries of Parcel B described in Appendix "A," excepting and excluding such facilities within an area commonly known as the Portland downtown core area....

ORDERED that Portland General Electric Company may transfer to Pacific Power & Light Company all electric distribution plant, including distribution substations, poles, lines, transformers, meters and related distribution facilities and all easements necessary for the operation thereof used for providing service in or lying within the boundaries of Parcels A and B, described in Appendix "B," attached hereto and made a part hereof, excluding however: (1) facilities described under the street light plant account of the Uniform Systems of Account, except that leased area lights will be conveyed by Portland General Electric Company to Pacific Power & Light Company; (2) certain duct lines owned, operated and maintained by Portland General Electric Company extending from Portland General Electric Company's Station "L" to Portland General Electric Company's facilities within the Portland downtown core area; and (3) standard wood poles used exclusively for street lighting; it is further

ORDERED that the real property necessarily incidental to the transmission and distribution substations and the fee interest in easements may be conveyed to the respective parties as provided by agreement between the companies; it is further

ORDERED that the manner and method for accomplishing the transfer and exchange of property, facilities and customers, and the terms and conditions governing this transfer, shall be as provided by that agreement between the companies herein, dated July 18, 1972.

Exhibit O to Marshall Affidavit, pp. 8–9.

At the time the 1972 Agreement was signed, Columbia was a customer of PGE and continues to purchase electricity from PGE pursuant to an Agreement for Electric Power Service (PGE Agreement),

which is automatically renewed on a yearly basis unless and until one party provides timely written notice of termination to the other party.

The electric rates for the industrial customers of Pacific are less than the electric rates for the industrial customers of PGE. Pacific owns a transmission line that crosses the plant site of Columbia.

Columbia and Pacific entered into negotiations in 1990 aimed at having Pacific, rather than PGE, furnish electricity to the plant site of Columbia. In April, 1990, Pacific notified Columbia that it would offer Columbia an electric power contract. PGE thereafter notified Columbia that, Pacific could not lawfully furnish electricity to Columbia because, in PGE's opinion, service by Pacific to Columbia would constitute a breach of the 1972 Agreement.

On May 30, 1990, Columbia advised PGE that because PGE had announced that it might seek, through litigation, to prevent Pacific from providing electricity to Columbia, Pacific had not constructed a substation necessary to supply Columbia with alternate electrical service. In the letter, Columbia requested PGE to deliver electricity to Columbia as of 12:00:01 a.m. July 1, 1990 and until the resolution of this litigation. In a letter to Columbia dated May 30, 1990, PGE stated its position, which was that Columbia was within the exclusive service territory of PGE, and therefore must purchase electricity from PGE.

On May 31, 1990, Pacific filed an action, Civil No. 90–524–FR, against PGE, Columbia and the PUC for a judicial declaration of the rights and obligations of the parties under the PGE Agreement, the 1972 Agreement, and the Sherman Antitrust Act.

On June 19, 1990, Columbia filed a related action against PGE, Pacific and the PUC (Civil No. 90–592–FR), which was thereafter consolidated with Civil No. 90–524–FR, seeking a judicial declaration that Columbia may terminate the PGE Agreement and take service from Pacific; that PGE does not have an exclusive right to serve Columbia under the terms of the 1972 Agreement; that the Portland City Char-

ter, the state utility laws, and the Portland franchise agreements permit Pacific to serve Columbia; and that Order # 72–870 of the PUC neither empowers or authorizes PGE to monopolize electric power service to Columbia, nor serves to foreclose Pacific from providing electrical service to Columbia.

In an Opinion and Order filed October 11, 1990, this court stayed all discovery upon the motions of Pacific and Columbia except as necessary "to resolve the issues relating to the claim of [PGE] that it has the exclusive right to provide electric services to [Columbia] and whether there is a legal defense to the regular and ordinary application of the antitrust laws." Opinion and Order, p. 4.

Pacific subsequently moved for voluntary dismissal of the initial action, Civil No. 90–524–FR, pursuant to Fed.R.Civ.P. 41(a)(2) on the grounds that Pacific and PGE resolved the issues in that action by executing a settlement agreement. The motion was granted, and the initial action has been dismissed.

Columbia now moves the court for an order granting partial summary judgment in its favor and for a declaration as follows: 1) that PGE does not have an exclusive right to furnish electricity to Columbia; 2) that Columbia has a right to seek electric power service from Pacific; and 3) that Order # 72–870 of the PUC neither empowers or authorizes PGE to monopolize the service of electric power to Columbia, nor does it serve to foreclose Pacific from providing electric power to Columbia.

## CONTENTIONS OF COLUMBIA

Columbia contends that the 1972 Agreement does not provide for the allocation of exclusive service territories within and around the City of Portland, and that the order of the PUC does not approve the allocation of exclusive service territories. Columbia further contends that the allocation of exclusive territories is unlawful in the City of Portland because the City of Portland has prohibited territorial allocations in its City Charter. Columbia argues

that O.R.S. 758.470(1) bars the PUC from granting applications for territorial allocations in the City of Portland because it states that "ORS ... 758.400 to 758.475 shall not be construed or applied to restrict the powers granted to cities to issue franchises."

Columbia further contends that the language of the 1972 Agreement provides only for the transfer of equipment, facilities, certain property, and customer accounts, but does not provide for the allocation in perpetuity of exclusive service territories. Columbia points out that the language of the 1972 Agreement does not contain the terms "territorial allocation," "exclusive service territory," or any other terms which can be interpreted to constitute an intent of the parties to provide for territorial allocations under O.R.S. 758.-410(1).

Columbia relies upon the language of the 1972 Agreement, the prior city ordinance, and the subsequent order of the PUC, which consistently refer to the 1972 Agreement as an "exchange" of properties or a "transfer" of facilities and customer accounts. Columbia argues that the use of these terms is significant in that the transfer of facilities was subject to the approval of the PUC under O.R.S. 757.480 *et seq.*, while the creation of exclusive service territories is subject to the approval of the PUC under O.R.S. 758.425(1).

Columbia points out that in their application to the PUC in 1972, PGE and Pacific sought approval only to exchange electric utility properties, service facilities, and customers under Chapter 757 of the Oregon Revised Statutes and did not seek approval of exclusive service territories under Chapter 758 of the Oregon Revised Statutes. Columbia argues that the absence of any reference in the order of the PUC to the statutes governing the creation of new territorial allocations as provided in O.R.S. 758.410(1) was not an oversight by the PUC.

Columbia asserts that the failure of PGE and Pacific to make any reference to Chapter 758 in their application to the PUC forecloses the Commissioner of the PUC from making any territorial allocation under Chapter 758 because the procedural rules of the PUC which were in effect in 1972 provided that any application must "state clearly and concisely the authorization or permission sought, [and] shall cite by appropriate reference the statutory provision or other authority under which the Commissioner's action is sought." Exhibit Q to Marshall Affidavit, p. 1 (Former OAR 860-13-025).

Columbia points out that PGE and the PUC had explicitly provided for the allocation of territories in agreements reached prior to the 1972 Agreement by using terms such as "allocation of service territories and customers between them." *See, e.g.*, Agreement between City of Cascade Locks and PGE (Exhibit T to Marshall Affidavit); Agreement between Consumers Power, Inc. and PGE (Exhibit CC to Declaration of Eric R. Todderud (Todderud Declaration)); Agreement between West Oregon Electric Coop, Inc. and PGE (Exhibit DD to Todderud Declaration); and Agreement between Tillamook County People's Utility District and PGE (Exhibit EE to Todderud Declaration). The Agreement between West Oregon Electric Coop, Inc. and PGE signed on February 26, 1962, for example, states, in part:

WHEREAS, the Coop and the Company each desire to prevent duplication of electric utility facilities within the territory hereinafter described by the allocation of service territories and customers between them, and by limiting the right of each to extend electric power distribution lines within the boundaries hereinafter established.

Exhibit DD to Todderud Declaration, p. 1. Columbia contrasts the language in the 1972 Agreement which states: "WHEREAS, Portland General and Pacific wish to provide for the elimination of duplicating electric utility facilities in the foregoing areas." Exhibit K to Marshall Affidavit, p. 1.

Columbia contends that the doctrine of state action does not permit this court to insert into the 1972 Agreement and the order of the PUC essential, but missing,

terms. Columbia argues that the order of the PUC which provides for the limited exchange of facilities and customers is not a grant of a perpetual and exclusive monopoly because the application submitted by PGE and Pacific did not ask for the authority to monopolize the supply of power in an area which had previously been subject to competition.

In the event that the court concludes that an exclusive territorial allocation exists, Columbia contends that this territorial allocation is invalid because it violates the Sherman Antitrust Act. Columbia argues that the doctrine of state action does not immunize PGE from federal antitrust liability because the State of Oregon has not clearly articulated a policy to displace competition for electric service customers in the City of Portland, and the laws of the State of Oregon do not provide for the active supervision of the displacement of competition under territorial allocation statutes.

## CONTENTIONS OF PGE

PGE has filed a cross-motion for summary judgment in its favor seeking an order of the court declaring 1) that the 1972 Agreement between Pacific and PGE, as approved by PUC Order # 72–870, lawfully allocates service territory in the City of Portland; 2) that PGE has an exclusive right to serve Columbia and any other customer within the geographic territory allocated to it in the 1972 Agreement as approved by the order of the PUC; and 3) that PGE is immune from antitrust liability with respect to the 1972 Agreement.

PGE argues that the statutes providing for territorial allocation do not require that the words "exclusive territorial allocation" or other similar words be used in the 1972 Agreement. PGE argues that the 1972 Agreement is, in fact, a contract as contemplated by O.R.S. 758.410(1) which allocates exclusive service territories. PGE argues that the 1972 Agreement is a lawful contract between two businesses who provide similar utility services. PGE argues that the 1972 Agreement is a contract for the purpose of allocating territories because the explicit purpose of the contract is to draw the boundaries of service areas, and because the parties declare in the 1972 Agreement itself that they want to elimi-

nate the duplication of services in those territories whose boundaries they have drawn. PGE contends that the 1972 Agreement specifically covers the allocation of customers in Section 7 and designates "which territories and customers are to be served by which of said contracting parties." O.R.S. 758.410(1).

PGE argues that the signators to the 1972 Agreement and all others involved, including the PUC, intended that the 1972 Agreement create exclusive service territories. PGE asserts that any question over the failure to expressly use the terms "exclusive service area" arose because the agreement was written by engineers and executives and not by lawyers.

PGE asserts that the creation of exclusive service territories does not conflict with the Charter of the City of Portland. PGE further asserts that the doctrine of state action immunizes the creation of exclusive service territories in the State of Oregon from the confines of the federal antitrust laws because the restraint shown here has been clearly articulated and affirmatively expressed as the policy of the State of Oregon by the PUC; that the order of the PUC approves the territorial allocation of the City of Portland; and that the laws of the State of Oregon provide for the active supervision of territorial allocations such as this one.

PGE admits that it was an oversight not to refer to Chapter 758 in the application that was made to the PUC for the territorial allocations, but argues that it was a technical defect that should be overlooked by the court. PGE explains that the reference to Chapter 757 may have been caused by the renumbering of Chapter 757 and 758 which occurred about that time. In any case, PGE contends that the requirement that the appropriate statutory reference be cited to the PUC is a rule of the PUC and has not been imposed by the legislature. PGE contends that the PUC did not find the defect significant in that it exercised jurisdiction over the transfer of customers which is authorized by Chapter 758 despite the fact that the statute was not properly identified in the application. PGE argues

that notwithstanding the proceedings before the PUC, these proceedings were in substance conducted under Chapter 758 despite the defect in label.

## POSITION OF THE PUC

The PUC takes no position on the motion for summary judgment filed by Columbia, but submits a memorandum which states the following three positions which are contrary to the arguments made by Columbia: 1) statutes relating to territorial allocation apply to the City of Portland; 2) one of the purposes of the statutes relating to territorial allocation is to displace competition statewide; and 3) the laws of the State of Oregon allow for the active supervision of the displacement of competition under territorial allocation statutes.

## APPLICABLE STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976).

## ANALYSIS

In *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), the United States Supreme Court declared that there was "no hint that [the Sherman Act] was intended to restrain state action or official action directed by a state." In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), the Court explained that its decisions "establish two standards for antitrust immunity under *Parker v. Brown*. First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." (Citations omitted).

The Oregon legislature, in enacting O.R.S. 758.400 to 758.475, has provided for the allocation of territories and customers of utilities providers. O.R.S. 758.405 states the legislative purpose for enacting statutes that provide for the allocation of territories and customers of utilities providers as follows:

> The elimination and future prevention of duplication of utility facilities is a matter of statewide concern; and in order to promote the efficient and economic use and development and the safety of operation of utility services while providing adequate and reasonable service to all territories and customers affected thereby, it is necessary to regulate in the manner provided in ORS 758.400 to 758.-475 all persons and entities providing utility services.[1]

O.R.S. 758.410, which is applicable to the facts of this case, provides, in relevant part, as follows:

> (1) Any person providing a utility service may contract with any other person providing a similar utility service for the purpose of allocating territories and customers between the parties and designating which territories and customers are to be served by which of said contracting parties; and the territories and customers so allocated and designated may include all or any portion of the territories and customers which are being served by either or both of the parties at the time the contract is entered into, or which

1. The purpose of the Oregon legislature in enacting these statutes was to address a statewide issue. O.R.S. 758.470(1) preserves the right of a city to exercise its franchise power to say "yes" or "no" to a utility company seeking permission to operate within the city. There is no basis for this court to conclude that the provisions of O.R.S. 758.400 to 758.475 do not apply to utilities lawfully operating within the City of Portland.

could be economically served by the then existing facilities of either party, or by reasonable and economic extensions thereto.

■ O.R.S. 758.400 to 758.475 articulate the policy of the State of Oregon to remove market competition as the basis for determining the customers of the providers of electricity. The PUC closely supervises compliance with these statutes and with the policy of the State of Oregon. To the extent that a public utility provider obtains a lawful and valid contract for the allocation of territories and customers through the provisions of the territorial allocation statutes, O.R.S. 758.400 to 758.475, that provider is immune from antitrust violations.

The difficult issue presented by this case is whether the 1972 Agreement was "for the purpose of allocating territories and customers between the parties and designating which territories and customers are to be served by which of said contracting parties" as provided in O.R.S. 758.410(1).

■ O.R.S. 758.400(1) states that " '[a]llocated territory' means an area with boundaries established by a contract between persons furnishing a similar utility service and approved by the commission or established by an order of the commission approving an application for the allocation of territory." In order to lawfully displace competition as the method of allocating customers for electric service in a particular area, utility companies must enter into a contract which allocates service territories and designates service to customers, and the utility companies must make application to and receive an order from the PUC approving and establishing the allocation of these territories. These requirements must be met in order to receive the immunity which is provided by the state statutory scheme from the federal antitrust laws.

■ PGE relies on the fact that the 1972 Agreement and the order of the PUC each state that the elimination of duplicate electrical facilities is the purpose behind the exchange of facilities. The 1972 Agreement states in the initial preamble:

"WHEREAS, Portland General and Pacific wish to provide for the elimination of duplicating electric utility facilities in the foregoing areas." Exhibit K to Marshall Affidavit, p. 1. The order of the PUC explains:

In the Portland areas affected by the transfer, both Portland General and Pacific have service extensions scattered throughout such areas. Both utilities have transmission and distribution facilities running throughout the area, often side by side or on the same poles. The individual facilities of either company are generally sufficient now or with minor modification to serve all customers in the area independently. Elimination of duplicating facilities will allow a more efficient and economical use of the respective companies' utility facilities.

Exhibit O to Marshall Affidavit, p. 3.

The state statutes require, however, that the allocation of territory must be "established by an order of the commission approving an application for the allocation of territory." O.R.S. 758.400(1). The order of the PUC relevant to this action states initially that "[o]n August 8, 1972, the Commissioner accepted for filing a joint application by [Pacific] and [PGE] for an order or orders approving and authorizing ... [t]he exchange of electric utility property and service facilities located in Multnomah and Columbia Counties." Exhibit O to Marshall Affidavit, p. 2. The conclusion of the PUC order provides, in relevant part, that:

Pacific Power & Light Company may *transfer* to Portland General Electric Company *all electric distribution plant* ... within the boundaries of Parcel A ... and within the boundaries of Parcel B ... and that Portland General Electric Company may *transfer* to Pacific Power & Light Company *all electric distribution plant* ... within the boundaries of Parcels A and B.

Exhibit O to Marshall Affidavit, p. 8 (emphasis added).

The order of the PUC authorized the "exchange of electric utility property and service facilities" within the parcels of land

indicated. The order of the PUC reflects the fact that the parties agreed in the 1972 Agreement only to an exchange of facilities within the area relevant to this action. The 1972 Agreement was not a contract whereby the parties allocated territories and customers within those areas for the provision of exclusive services and limited their rights to operate within the parcels in the future. The order of the PUC did not order the allocation of territories and customers and did not designate which territory was to be served by which contracting party.

The purpose of the doctrine of state action was to allow a state to authorize certain acts not otherwise open to private parties. It would be contrary to the purpose of the doctrine of state action to allow private parties to claim monopolies that have not been specifically and clearly authorized by the relevant statutory process.

### CONCLUSION

The court concludes that Columbia is entitled to a declaration that Order # 72–870 of the PUC neither empowers nor authorizes PGE to monopolize the service of electric power to Columbia.

The motion for partial summary judgment of Columbia (# 72) is granted. The cross-motion for summary judgment of PGE (# 82) is denied.