COLUMBIA STEEL CASTING CO., INC., an Oregon corporation, Plaintiff–Appellee,

v.

PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation, Defendant–Appellant.

COLUMBIA STEEL CASTING CO., INC., an Oregon corporation, Plaintiff–Appellant,

v.

PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation; Public Utility Commission of the State of Oregon, Defendants–Appellees.

Nos. 93–35902, 93–35958.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 3, 1995.

Decided July 20, 1995.

Allan M. Garten and Barbee B. Lyon, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, OR, for Portland Gen. Elec. Co.

Michael C. Dotten, Heller, Ehrman, White & McAuliffe, Portland, OR, for Columbia Steel Casting Co., Inc.

Jas J. Adams, Asst. Atty. Gen., Salem, OR, for the Public Utility Com'n of Oregon.

Before BROWNING, REAVLEY *, and NORRIS, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

This case involves the antitrust doctrine of state action immunity. Appellee Columbia Steel (Columbia) sued appellant Portland General Electric (PGE) in district court, alleging that PGE had conspired with Pacific Power and Light (PP & L) to divide the market for electricity in Portland, Oregon. The district court granted summary judgment for Columbia, rejecting PGE's claim that a 1972 order of the Public Utility Commission of Oregon (PUC) had authorized the market division, thereby conferring federal antitrust immunity under the state action doctrine created in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). PGE appeals the summary judgment in favor of Columbia and the denial of its own motion for summary judgment. We now reverse.

I

Until the early 1970s, Portland General Electric and Pacific Power & Light competed with one another to provide electricity to the residents and businesses of Portland. This competition resulted in duplicate transmission lines and poles, substations and transformers throughout the City. In 1961, the Oregon legislature enacted a statute empowering the PUC to authorize division of markets into exclusive service territories in order to promote "[t]he elimination and future prevention of duplication of utility facilities." Or.Rev.Stat. § 758.405. The statute provides that under certain circumstances, the PUC may approve a contract between competitors that divides a market into exclusive service territories. Or.Rev.Stat. §§ 758.410–758.450. Once the PUC has issued an order creating exclusive service territories, Or.Rev.Stat. § 758.465 prohibits any competition within those territories.

In 1972, PGE and PP & L entered into an agreement to exchange properties and customer accounts throughout the City of Portland (the Agreement). In simplified form, the Agreement divided the City and transferred properties and customers, thereby creating separate territories in which one utility or the other owned all the facilities and serviced all the customer accounts.[1] Be-

---

* The Honorable Thomas M. Reavley, Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. The Agreement provided, in relevant part:

NOW, THEREFORE, in order to implement the elimination of said duplicating facilities ... it is agreed:

    1. *Exchange of Facilities*

fore presenting this Agreement to the PUC, the parties sought the approval of the City. The City consented to the Agreement by ordinance on April 26, 1972.[2] The Agreement was subsequently approved by the PUC through Order 72–870, which provides, in part:

The Commissioner's approval is needed prior to the sale, lease, assignment or other disposition of public utility property pursuant to ORS § 757.480. The Commissioner's approval is also needed prior to the assignment of any allocated utility service territory pursuant to ORS § 758.460.

On July 18, 1972, Pacific and Portland General entered into an agreement whereby an exchange of property and utility facilities would be made.... This exchange and transfer also involves the transfer of customers from one party to the other.

....

ORDERED that the application of [PP & L] to transfer certain of its exclusively served area allocated to it and lying in and around Rainier, Oregon, to [PGE] is approved....

(a) Pacific shall transfer and convey to Portland General ... all of the electric distribution plant, including distribution substations, poles, lines, transformers, meters ... maintained by Pacific in the area designated as Pacific's Rainier service district ... and in the area designated as Parcel C....

(b) Portland General shall transfer and convey to Pacific ... all of the electric distribution plant, including distribution substations, poles, lines, transformers, meters ... maintained by Pacific in the areas designated as Parcels A and B....

....

7. *Transfer of Customer Accounts*

The transfer of customer accounts between Portland General and Pacific shall commence on July 24, 1972, and shall be coordinated so that revenue from the sales of electricity of each company will remain substantially the same over the period required to accomplish transfer of all customers involved. At the time of such transfer, each party shall make available to the other a list of the transferred customers, together with accounting, billing, service and historical sales records relating thereto....

2. The ordinance states, in part:

An Ordinance consenting to exchange of certain property within the City between Portland General Electric Company and Pacific Power

ORDERED that [PP & L] may transfer to [PGE] all electric distribution plant ... situated within or used for providing utility service within the boundaries of Parcel A ... [and] Parcel B....[3]

ORDERED that [PGE] may transfer to [PP & L] all electric distribution plant ... used for providing utility service within the boundaries of [Parcel C]....

....

ORDERED that the manner and method of accomplishing the transfer and exchange of property, facilities and customers, and the terms and conditions governing this transfer shall be provided by that agreement between the companies herein, dated July 18, 1972....

Pub.Util.Comm'n of Or., Order 72–870 (Dec. 15, 1972) (the 1972 Order).

In the years that followed, PGE and PP & L did not compete with each other in their respective territories. During this time, Columbia Steel was served by PGE. However, in 1989, reacting to the difference in industrial rates charged by PP & L and PGE, Co-

& Light Company on certain conditions in order to permit reduction of poles and wires and duplication of facilities in various areas of the City.

The City of Portland ordains:

Section 1. The Council finds that both [PGE] and [PP & L] operate electric power systems which serve patrons within the City, that both companies operate under non-exclusive franchises and that the obligation to supply properties within the City must remain binding upon both companies; that at the present time, however, in many areas of the City poles and wires are duplicated between the companies for service purposes....; that to reduce the visual impact of duplicating facilities, to promote safety, to promote economy, to simplify subsequent undergrounding and to work toward the lowest possible rate for users within the City, an interchange of properties between the companies should be permitted as hereinafter set forth ... now, therefore, the City does by this ordinance consent to the sale, transfer and exchange of plant and property between [PGE and PP & L] as follows.

Portland, Or., Ordinance 134416 (Apr. 26, 1972).

3. Parcels A, B, and C are all within the City of Portland. The City of Rainier service area had previously been allocated to PP & L as an exclusive service territory by the PUC.

lumbia requested PP & L to provide electrical service to its Portland plant. After considering Columbia's request, PP & L informed both PGE and Columbia that it would offer to provide electricity to Columbia. PGE objected that PP & L was forbidden from selling power to Columbia by the 1972 Agreement and the 1972 Order, which, PGE claimed, had created exclusive service territories in Portland.

In June, 1990, Columbia filed an action in federal court against PGE, PP & L and the PUC, requesting a declaration that any purported division of Portland into exclusive territories was beyond the scope of the 1972 Order and a violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. Columbia also asked for treble damages. In its answer, PGE raised a defense of state action immunity, claiming that the 1972 Order had authorized exclusive service territories in Portland pursuant to state law.

While this action was pending in federal district court, PGE filed an application with the PUC, requesting a declaration that the 1972 Order allocated exclusive service territories in Portland. The district court denied PGE's subsequent motion to stay the federal case pending the PUC's ruling on this application, and proceeded to consider cross-motions for summary judgment on the immunity issue.

In July, 1991, the district court granted partial summary judgment to Columbia, holding that the 1972 Order did not confer antitrust immunity on PGE's attempts to divide the Portland market. The court reasoned that the 1972 Order did not "clearly articulate" the intention of the PUC to divide Portland into exclusive service territories, but instead was limited to the exchange of property and facilities and a one-time transfer of customer accounts. *Pacificorp v. Portland Gen. Elec. Co.*, 770 F.Supp. 562, 571 (D.Or.1991).

Nine months later, in April, 1992, the PUC issued its ruling on PGE's application for a declaratory order, stating that while "perhaps [the 1972 Order] did not unambiguously allocate exclusive service territories to PGE and PP & L," it was the PUC's intent to approve such an allocation. Pub.Util.

Comm'n of Or., Order 92–557 (Apr. 16, 1992). The PUC therefore amended its 1972 Order, *nunc pro tunc*, to make this intention clear. In response to this ruling, PGE requested that the district court reconsider its summary judgment decision and afford full faith and credit to the PUC's decision. The district court denied the motion.

Subsequently, the court entered summary judgment on the remaining issues, holding that PGE had violated § 1 of the Sherman Act and awarding Columbia $508,425 in treble damages and $901,671.62 in attorney's fees and costs.

## II

■■■ Our discussion of the state action doctrine begins with *Parker v. Brown,* 317 U.S. 341, 350–51, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), in which the Supreme Court reasoned that Congress did not intend the Sherman Act "to restrain a state or its officers or agents from activities directed by its legislature." The Court held, therefore, that acts of a state are immune from antitrust liability. This basic premise has evolved into a multitiered analysis for determining when an anticompetitive act may be cloaked with antitrust immunity because it implements state policy. Immunity is automatically granted to any action taken by a state legislature or by a state court in its legislative capacity. *See Hoover v. Ronwin,* 466 U.S. 558, 567–68, 104 S.Ct. 1989, 1994–95, 80 L.Ed.2d 590 (1984). However, "when the activity at issue is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization," closer analysis is required to assure that the challenged action represents an implementation of state policy rather than private or parochial interests. *Id.* at 568, 104 S.Ct. at 1995. Thus, immunity is granted to the acts of state agencies or municipalities only if "the conduct is pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation." *See Hoover,* 466 U.S. at 568–69, 104 S.Ct. at 1995.

■■■ The acts of private parties, such as those at issue in this case, are scrutinized even more carefully to assure that the "pri-

vate party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). To that end, the actions of a private party are immunized only after passing a two-pronged test: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Federal Trade Commission v. Ticor Title Ins. Co.,* 504 U.S. 621, 633, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410 (1992).

There is no question that the Oregon legislature has clearly and expressly chosen to replace competition with regulation in the utilities industry by allowing the PUC to approve agreements to divide markets into exclusive service territories. *See* Or.Rev. Stat. §§ 759.500–759.570. The issue in this case is the clarity with which the PUC must express its approval and whether that standard has been met here.

■■■ When a state legislature authorizes anticompetitive behavior contingent upon approval by a state agency, that approval must be "clearly articulated and affirmatively expressed." *Cf. California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶ 214e (1978). While the clear articulation test originally developed in a slightly different context—cases examining whether a state statute had "clearly articulated and affirmatively expressed" a policy to permit particular anticompetitive conduct [4]— its underlying policy rationale applies with equal weight when the authorizing entity is a regulatory agency, rather than a state legislature. As in its original context, the clear articulation test here serves to "ensure that private parties [can] claim state-action immunity only when their anticompetitive acts

[are] truly the product of state regulation," *Patrick,* 486 U.S. at 100, 108 S.Ct. at 1662. We therefore hold that when a private party claims state action immunity conferred by a state agency, the clear articulation test must be satisfied as to purported authorizations by both the state legislature and the state agency. That is to say, not only must the state make clear that it is delegating authority to the PUC to approve market divisions, but the PUC must also exercise this authority clearly and expressly. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 214e.

The next question, then, is how clearly an agency must express its approval. Columbia argues that the PUC could not have immunized the PGE–PP & L agreement not to compete in Portland without clearly expressing an intent to permit a division of the City into exclusive service areas. PGE responds that the PUC's actions meet the "clear articulation" requirement even if the 1972 Order is somewhat ambiguous. In order to reach this result, argues PGE, we should apply a "foreseeability" standard, rather than a clear statement rule, in analyzing the PUC's actions under the *Parker* test.

In support of its argument for a "foreseeability" standard, PGE cites a series of cases regarding actions taken by subunits of state government pursuant to statutory authorization. Although these decisions do not address conduct by private parties, the Court's analysis is applicable to the case at hand. In *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Court adopted the view of the plurality in *Lafayette v. Louisiana Power & Light,* 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978), holding that "[i]t is not necessary . . . for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects." *Town of Hallie,* 471 U.S. at 42, 105 S.Ct. at 1718. Instead, the Court held that

4. *See City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 370–73, 111 S.Ct. 1344, 1348–50, 113 L.Ed.2d 382 (1991); *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 54–56, 102 S.Ct. 835, 842–43, 70 L.Ed.2d 810 (1982); *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 41–44, 105 S.Ct. 1713, 1717–19, 85 L.Ed.2d 24 (1985); *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 63–65, 105 S.Ct. 1721, 1730–31, 85 L.Ed.2d 36 (1985); *Midcal,* 445 U.S. at 99–100, 102–103, 100 S.Ct. at 940, 941–42; *Patrick v. Burget,* 800 F.2d 1498, 1505 (9th Cir.1986), *rev'd on other grounds,* 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988).

immunity was extended to a municipality's actions if "the legislature contemplated the kind of action complained of." *Id.* at 44, 105 S.Ct. at 1719 (quoting *Lafayette*, 435 U.S. at 415, 98 S.Ct. at 1138). As our court later explained, when a state delegates power to a subunit of state government, it "must be assumed to have contemplated the use of restraints on competition that are a reasonable consequence or necessary corollary of anticompetitive restrictions authorized by the legislature." *Washington State Elec. Contractors Ass'n v. Forrest,* 839 F.2d 547, 553 (9th Cir.), *cert. granted & vacated on other grounds,* 488 U.S. 806, 109 S.Ct. 38, 102 L.Ed.2d 17 (1988). Thus, in cases challenging anticompetitive acts of municipalities, the Supreme Court has held that the clear articulation test is met if a municipality's "suppression of competition is the 'foreseeable result' of what the statute authorizes." *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 373, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991).

In *Nugget Hydroelectric v. Pacific Gas and Electric,* 981 F.2d 429 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993) and *Medic Air Corp. v. Air Ambulance Auth.,* 843 F.2d 1187 (9th Cir.1988), this court extended the "foreseeability" standard to cases in which a private party claimed state agency authorization of its anticompetitive acts. We therefore follow *Nugget Hydroelectric* and *Medic Air* and apply the "foreseeability" standard here.

In *Nugget Hydroelectric,* 981 F.2d at 433–35, we considered whether regulations promulgated by a state public utility commission were sufficiently clear to confer state action immunity on a privately owned utility. We stated that the utility would be entitled to state action immunity if the conduct was "clearly articulated and affirmatively expressed as state policy. This may be satisfied if the conduct is a 'foreseeable result' of the state's policy." *Id.* at 434. We then scrutinized the relevant PUC regulation and determined that the defendant's action was "a foreseeable result of state policy, and therefore satisfies the clear articulation requirement of the state action doctrine." *Id.*

In *Medic Air Corp.,* 843 F.2d at 1189, a county agency designated an air ambulance company as the exclusive air ambulance dispatcher in Washoe County, Nevada. We held that this authorization did not immunize the company from complaints that it was using its position as exclusive dispatcher to direct ambulance business to itself and to exclude its competitors. In so doing, we applied the foreseeability standard, stating "[t]he alleged anticompetitive conduct was not a 'necessary or reasonable consequence' of the [agency's] decision to establish an exclusive dispatcher." *Id.* (quoting *Springs Ambulance Svc., Inc. v. City of Rancho Mirage,* 745 F.2d 1270, 1273 (9th Cir.1984)).

■ Under existing Ninth Circuit caselaw then, private conduct is immunized if it is a foreseeable result of state agency action and if circumstances justify an inference that the agency intended to authorize the conduct. We now turn to the question whether PGE's conduct in agreeing with PP & L to divide Portland into exclusive service territories was a foreseeable result of the PUC's 1972 Order.

### III

■ We agree with the district court that "[t]he difficult issue in this case is whether the 1972 Agreement effected a territorial division of customers as contemplated by the Oregon legislature." 770 F.Supp. at 570. Unfortunately, the 1972 Order is not particularly clear regarding the PUC's intention to permit a permanent division of the Portland market, as opposed to a one-time exchange of facilities and customer accounts. For this reason, the district court held that the Order failed to meet a strict "clear articulation" test. However, we believe that under our current, more liberal "foreseeability" standard, the 1972 Order is sufficiently clear to cloak the PGE–PP & L agreement with state action immunity.

Columbia argues that PGE's anticompetitive conduct was not a foreseeable result of the 1972 Order because the Order limits PUC approval to an exchange of properties and a one-time transfer of customer accounts. Columbia points out that the Order never uses the term "exclusive territory" to

refer to the arrangement being approved, even though it does use that term to describe the area around the City of Rainier, which had previously been declared the exclusive territory of PP & L. Furthermore, in setting the legal framework for the PUC ruling on the application, the Order does not mention the statutory provisions that authorize the PUC to approve agreements creating exclusive service territories (Or.Rev.Stat. §§ 758.410–758.440), even though it does refer to the statutory provisions requiring PUC approval for the sale of utility company property (Or.Rev.Stat. § 757.480) and for the transfer of a previously allocated exclusive territory (*Id.* at § 758.460).

We agree that these omissions tend to create the impression that the PUC did not intend to approve the creation of new exclusive service areas for PGE and PP & L in the City of Portland. But such a reading of the 1972 Order would leave ambiguous the purpose behind the PUC's clear authorization of a transfer of facilities and customer accounts between PGE and PP & L. Columbia argues that by approving the transfer, the PUC may have intended to authorize the creation of de facto exclusive territories, but only on a temporary basis. PGE, however, points to other aspects of the Order to support its position that the PUC intended to approve a long-term division of Portland into two exclusive service areas.[5] Most powerfully, PGE argues that there would be little point in creating single-provider territories if customers could later choose to return to their original provider. The initial division was desirable largely because it eliminated the need for duplicate poles, lines and other facilities in each territory. This benefit would be lost if each utility were at liberty to serve customers in the other's area by again duplicating poles and lines.

Columbia responds first by suggesting that the PUC intended to permit customers to switch utilities by requiring the primary utility in their area to transport its competitor's electricity to them through a process called "wheeling." With the wheeling process in use, only one set of power lines and facilities would be required for each territory, but each customer would still have a choice of providers. Columbia has not shown, however, any indication of an intention on the part of the PUC to permit or require wheeling arrangements; indeed, we find some indication that the PUC intended the contrary. The original version of the 1972 Agreement provided that employees of each utility would continue to be served by their employers regardless of the territory in which they lived, apparently in order to permit the utility workers to continue receiving employee discounts on electricity. In the final version of the 1972 Order, however, utility employees were required to purchase from the utility serving the area in which they lived. The 1972 Order provides:

> This method results in discrimination in that the company serving the area should serve all persons living in that area and, just because the customer is an employee of the utility, this should not permit him the right to choose which utility he will take.... [T]hese employees, like any other customers in the area, must become the customers of the new utility serving the area.

Order 72–870 at 7. Thus the PUC did not permit wheeling even for the narrow purpose of allowing utility employee-customers to be served by their respective employers. This amendment to the original order is, of course, inconsistent with Columbia's position that the transactions between PGE and PP & L, which necessarily resulted in separate service areas, were approved by the PUC as temporary, de facto measures that could be circumvented by "wheeling."

Columbia next argues that the PUC intended at least to permit customers to change providers when doing so would not require duplication of facilities. Again, the facts of this case are to the contrary. Although PP & L continued to own a transmission wire running across Columbia's property which would have enabled PP & L to serve

---

5. PGE also argues that the district court erroneously failed to give full faith and credit to the PUC's 1992 decision interpreting and amending the 1972 Order to make clear that it intended to create exclusive service territories in 1972. Because we reverse on the basis of our reading of the 1972 Order, we do not reach the full faith and credit question.

Columbia without duplicating PGE's facilities, there is nothing in the Order to suggest that the PUC intended to permit PP & L to serve a customer in PGE's territory in this way. Although such an exception might have been consistent with the PUC's overall goals, there is no indication that the 1972 Order permitted it.

PGE argues that Columbia's position is undercut by six orders issued by the PUC between 1972 and 1989. According to PGE, these orders render its understanding of the 1972 Order more reasonable, and its 1989 decision to oppose PP & L's service to Columbia more foreseeable. Order 74–658 addresses the issue at hand most directly.[6] In it, the PUC denied PP & L's request for a tariff that would equalize the two utilities' rates in Portland, reasoning that "[t]he two companies no longer competitively serve the same area. Their respective areas of service within Portland have been defined." Pub. Util.Comm'n of Or., Order 74–658 (Sept. 3, 1974), aff'd sub nom American Can Co. v. Davis, 28 Or.App. 207, 559 P.2d 898 (1977). This official statement, issued before the acts that gave rise to this lawsuit,[7] is an authoritative clarification of PUC intention.[8]

Columbia responds that Order 74–658 did nothing more than observe that the utilities were not, in fact, competing, and so did not address whether they were legally entitled to refrain from competition. But this interpretation fails to account for the PUC's statement that the utilities' "respective areas of service within Portland have been defined." Surely if the PUC observed that the utilities had carved out exclusive territories without PUC approval, it would have taken action to prevent this violation of its 1972 Order. The most reasonable interpretation of this statement is that the PUC believed in 1974 that the 1972 Order had created exclusive service territories which the utilities were respecting.

Columbia's strongest argument is that the Agreement and 1972 Order were intentionally made ambiguous in order to slip the Agreement past the City of Portland, which had successfully opposed a past attempt by PGE to be allocated exclusive service territories in the City. Before presenting their agreement to the PUC, the utilities sought approval from the City.[9] Columbia

---

6. The other orders cited by PGE are less clear, but are also consistent with PUC approval of exclusive service territories. In 1975, the PUC noted that PP & L served customers "in parts of Portland." Pub.Util.Comm'n of Or., Order 75–704 (Aug. 13, 1975). Orders issued in 1973 and 1979 described PGE's "service area" as situated "within a state-approved service area allocation." Pub.Util.Comm'n of Or., Order 73–688 (Oct. 25, 1973); Pub.Util.Comm'n of Or., Order 79–055 (Jan. 25, 1979).

7. Of course, PGE cannot base its foreseeability argument on the clarifications made by the PUC after the anticompetitive conduct at issue in this case, since it could not have relied upon those statements when it decided to oppose the transfer of Columbia to PP & L. The question is whether the anticompetitive actions were authorized when undertaken, which turns on whether they were a foreseeable consequence of the actions the PUC had taken up to that point. Thus, neither the PUC's retroactive amendment of its 1972 Order in 1992, nor its litigation positions in this case, can create PGE immunity for actions taken in 1989–90.

8. Both PGE and Columbia also present a variety of extrinsic evidence, including deposition testimony of former PUC Commissioners, to demonstrate the Public Utility Commissioners' subjec-

tive understandings of what they intended to approve in 1972. The district court properly refused to consider such evidence. Immunity is conferred by the official actions of state government, not by the subjective intentions of state officials.

9. There is a dispute over whether City approval was actually necessary in order to proceed with the proposal before the PUC. Columbia points to the franchise agreement between PP & L and the City, which authorizes PP & L to use the public streets for transportation of electricity. The ordinance granting this franchise includes a provision requiring City approval of any anticompetitive combinations between PP & L and any other provider. PGE and the PUC argue that the City does not have the power to use its franchising authority to veto exclusive service territories created by the PUC pursuant to Or. Rev.Stat. §§ 758.410 et seq. For our purposes, it makes little difference whether the utilities were required to receive City approval, or simply chose to solicit approval to avoid City opposition to the proposal before the PUC. In granting state action immunity, we do not inquire whether "the state's attempted exercise of its power is imperfect in execution under its own law.... Ordinary errors or abuses in the administration of powers conferred by the state should be left for state tribunals to control." Llewellyn v.

presents evidence to show that the City was adamantly opposed to any agreements that would result in the division of Portland into exclusive service territories.[10] PGE admits that while prior drafts of the Agreement included specific language making clear that the parties intended to create such territories, that language was removed before the contract was presented to the City. This had the natural result of making the contract more ambiguous and thereby less politically vulnerable.

Columbia suggests that these facts establish either 1) that in response to the known opposition of the City to monopolistic agreements, the utilities did not ask for and did not receive permission from the PUC to create exclusive service territories; or 2) that the utilities succeeded in slipping a monopolistic agreement past the City, a ploy that should not be awarded with antitrust immunity. Both arguments have some force, but we ultimately find them unconvincing.

Even assuming that Columbia has described this context accurately, we still must conclude that the 1972 Order had the foreseeable effect of leading PGE and PP & L to stop competing in the territories created by that Order. If the PUC had in fact intended to bow to potential pressure from the City and to decline to authorize permanent exclusive territories, we cannot see why it would have chosen, nonetheless, to permit a massive, one-time transfer of thousands of customer accounts to create merely temporary exclusive territories. We must conclude that the elimination of competition between PGE and PP & L was a natural and foreseeable

result of the 1972 Order, especially as clarified by Order 74–658.

■■■ Second, while Columbia's allegations about PGE's maneuvering are forceful, we conclude that they cannot affect the outcome of the state action immunity analysis in this case. The question of immunity ultimately turns on whether the State, acting through the PUC, approved the division of the market. We do not inquire into the wisdom of the State's decision. Nor do we inquire whether the parties were conspiring to hoodwink the City of Portland or otherwise acting in bad faith. *See Columbia,* 499 U.S. at 376–78, 111 S.Ct. at 1352. "The availability of *Parker* immunity … does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* and the authorities which interpret it." *Llewellyn v. Crothers,* 765 F.2d at 774. These authorities make clear that regardless of the tactics used to secure state authorization, "*any* action that qualifies as state action is '*ipso facto* … exempt from the operation of the antitrust laws.'" *Columbia,* 499 U.S. at 377–78, 111 S.Ct. at 1352–53 (quoting *Hoover,* 466 U.S. at 568, 104 S.Ct. at 1995).

## CONCLUSION

Under our current caselaw, the "clear articulation" requirement, even when applied to private conduct, requires only that the anticompetitive conduct be sufficiently foreseeable to justify the inference that it was intended by the authorizing agency.[11] We

*Crothers,* 765 F.2d 769, 774 (9th Cir.1985) (internal quotation marks omitted); *see also City of Columbia,* 499 U.S. at 371–72, 111 S.Ct. at 1349. Thus, even if the PUC lacked authority under state law to approve an agreement to create exclusive service territories in derogation of the City's franchising power, this is one of the "[o]rdinary errors or abuses in the administration of powers" that do not defeat a claim for state action immunity.

10. In 1962, PGE filed an application with the PUC for creation of exclusive service territories for PGE in the areas it served throughout the state, including in Portland. The City passed a resolution opposing the application, claiming that it interfered with the City's right to regulate service in the City by controlling franchises.

Portland, Or., Resolution 28879 (Aug. 22, 1962). PGE then amended its application to exclude an allocation in Portland, after which the City withdrew its opposition and the PUC approved the application.

In its 1972 ordinance, the City also stated that "both companies operate under non-exclusive franchises and that the obligation to supply properties within the City must remain binding upon both companies." Ordinance 134416. Columbia argues that this shows the City's continuing opposition to exclusive service territories and its understanding that the 1972 Agreement did not provide for them.

11. In a footnote in its brief, Columbia asserts—but does not argue—that PGE fails the "active supervision" prong of the state action immunity

therefore conclude that the district court erred in granting Columbia summary judgment and in denying summary judgment to PGE.

We REVERSE the summary judgment in favor of Columbia Steel and REMAND to the district court for entry of judgment in favor of Portland General Electric.

test and cites its brief before the district court. Appellee's Opening Brief at 17 n. 16. PGE argues that this does not suffice to raise the issue. Appellant's Reply Brief at 6. We decline to order a remand to consider an issue raised in such a manner and having so little merit. The PUC had and exercised the authority to approve or disapprove the market division, was actively involved in overseeing the details of the division of the Portland market, and continues to exercise extensive control over the behavior of the utility companies pursuant to statute. *See* Or.Rev.Stat. §§ 756.040, 756.070–756.200, 758.400–758.470; *Patrick v. Burget*, 486 U.S. at 101–02, 108 S.Ct. at 1663; Public Util.Comm'n of Or., Order 72–870 (Dec. 15, 1972).