COLUMBIA STEEL CASTING CO., INC., an Oregon corporation, Plaintiff-Appellee,

v.

PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation, Defendant-Appellant.

COLUMBIA STEEL CASTING CO., INC., an Oregon corporation, Plaintiff-Appellant,

v.

PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation; Public Utility Commission of the State of Oregon, Defendants-Appellees.

Nos. 93-35902, 93-35958.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 3, 1995.

Decided July 20, 1995.

Opinion Withdrawn Dec. 27, 1996.

Decided Dec. 27, 1996.

As Amended on Denial of Rehearing and Rehearing En Banc April 3, 1997.

1428

Allan M. Garten and Barbee B. Lyon, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Oregon, for Portland General Electric Company.

Michael C. Dotten, Heller, Ehrman, White & McAuliffe, Portland, Oregon, for Columbia Steel Casting Co., Inc.

Jas. J. Adams, Assistant Attorney General, Oregon Department of Justice, Salem, Oregon, for the Public Utility Commission of Oregon.

Robert B. Nicholson and David Seidman, United States Department of Justice, Washington, DC, for the United States as amicus curiae.

**1432**

## ORDER

The opinion filed on December 27, 1996, 103 F.3d 1446, is amended as follows:

With the above amendments, the panel, as constituted above, has voted unanimously to deny the petition for rehearing. Judge Browning has voted to reject the suggestion for a rehearing en banc, and Judges Reavley and Norris have recommended the same.

The full court has been advised of the suggestion for en banc rehearing and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed. R.App.P. 35(b).

The petition for rehearing is DENIED, and the suggestion for a rehearing en banc is REJECTED.

Before: BROWNING, REAVLEY *, and NORRIS, Circuit Judges.

## ORDER

The Petition for Rehearing, filed August 3, 1995, is hereby GRANTED.

The Opinion filed July 20, 1995, and reported at 60 F.3d 1390, 1396 (9th Cir.1995), is WITHDRAWN and the attached Opinion is ordered filed instead.

## OPINION

WILLIAM A. NORRIS, Circuit Judge:

### TABLE OF CONTENTS

I. Facts and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1433

II. State–Action Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1436
 A. The Midcal Clear Articulation Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . .1436
 B. Issue Preclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1441
 C. Foreseeability: PGE's New Argument on Appeal . . . . . . . . . . . . . . . . . . . . . . . . .1442

III. PGE's Other Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1444
 A. Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1444
 B. Justification Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1445
 C. The Noerr–Pennington Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1445
 D. The Filed Rate Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1446

IV. Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1446

V. Columbia Steel's Cross–Appeal on Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1447

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1447

---

This appeal arises out of an antitrust action that Columbia Steel Casting Co., a large consumer of electric power in Portland, Oregon, brought against two electric utilities, Portland General Electric (PGE) and Pacific Power & Light (PP & L), charging them with dividing the city of Portland into exclusive service territories in violation of the Sherman Act, 15 U.S.C. §§ 1–2.[1] PGE raised a state-action immunity defense on the basis of a 1972 order of the Oregon Public Utility Commission which, PGE argued, approved a division of the Portland market into exclusive service territories. *See Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The district court rejected this state-action immunity defense and awarded summary judgment to Columbia Steel. PGE appeals the summary judgment in favor of Columbia Steel and the denial of its own motion for summary judgment. Columbia Steel cross-appeals the amount of its damage

* The Honorable Thomas M. Reavley, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. Only PGE is a party to this appeal.

award. We affirm the summary judgment in favor of Columbia Steel on PGE's antitrust liability and vacate and remand the damage award for further proceedings.

## I. Facts and Procedural History

The facts are undisputed. Until 1972, PGE and PP & L competed for customers throughout Portland. This competition resulted in the duplication of transmission lines and poles, substations, and transformers throughout the city. For many years the two utilities attempted to gain regulatory approval for a division of the Portland market into exclusive service territories. In 1962, for example, PGE applied to Oregon's Public Utilities Commission (OPUC) for an allocation of an exclusive service territory in the city of Portland.[2] These efforts to secure exclusive service territories within Portland were unsuccessful, however, in part because of opposition from the city. Portland had a longstanding policy of encouraging competition among utilities, and the city charter provided that "[n]o exclusive franchises shall be granted." Portland City Charter, § 10–206. *See, e.g.*, Portland, Or., Resolution 28879 (1962) (opposing PGE's 1962 application to the OPUC for an "allocation of exclusive areas for electric service within ... Portland").

In 1972, PGE and PP & L jointly submitted to the city of Portland a plan to eliminate competition between them by dividing the city into exclusive service territories. This plan provided, *inter alia*, that "[s]ubject to the necessary regulatory approvals ... it is proposed that Parcels A & B [two defined areas within the city of Portland] be served exclusively by PP & L," and that "[s]ubject to the necessary approvals, it is proposed that Parcel C [a defined area within the city of Portland] ... be exclusively served by PGE." CR 269, exh. 47 at 2–3.

The Portland City Council disapproved the utilities' 1972 plan to displace competition with territorial monopolies in Portland. The City Council agreed, however, that the duplication of facilities should be eliminated for aesthetic, safety, and economic reasons. In the ordinance it passed, the City Council declared, "both [PGE and PP & L] operate under non-exclusive franchises and ... the obligation to supply properties within the City must remain binding upon both companies." Portland, Or., Ordinance 134416 (Apr. 26, 1972). The only action that the ordinance approved was "the sale, transfer and exchange of plant and property between PGE and PP&L."[3] *Id.*

After securing the City Council's approval of the exchange of utility properties, but not the establishment of exclusive service territories, PGE and PP & L entered into an agreement, dated July 18, 1972 (the "1972 Agreement"), which they submitted to the OPUC for approval. In contrast to the plan submitted to the Portland City Council, the 1972 Agreement said nothing about exclusive service territories in Portland. The "where-

2. In 1961, the Oregon legislature enacted a statute vesting in the OPUC exclusive authority to approve the creation of exclusive service territories in order to promote "[t]he elimination and future prevention of duplication of utility facilities." Or.Rev.Stat. § 758.405. The statute authorizes the OPUC to approve contracts between competitors that divide markets into exclusive service territories. Or.Rev.Stat. §§ 758.410—758.425, 758.450.

3. The Ordinance states, in part:

An Ordinance consenting to exchange of certain property within the City between [PGE] and [PP & L] on certain conditions in order to permit reduction of poles and wires and duplication of facilities in various areas of the City.
 The City of Portland ordains:
 Section 1. The Council finds that both [PGE] and [PP & L] operate electric power systems which serve patrons within the City, that *both companies operate under non-exclusive franchises and that the obligation to supply properties within the City must remain binding upon both companies;* that at the present time, however, in many areas of the City poles and wires are duplicated between the companies for service purposes ....; that to reduce the visual impact of duplicating facilities, to promote safety, to promote economy, to simplify subsequent undergrounding and to work toward the lowest possible rates for users within the City, an interchange of properties between the companies should be permitted as hereinafter set forth; ... now, therefore, *the City does by this ordinance consent to the sale, transfer and exchange of plant and property between [PGE] and [PP & L]* as follows ....

Portland, Or., Ordinance 134416 (Apr. 26, 1972) (emphasis added).

as" clauses of the 1972 Agreement recited that one of its purposes was to comply with the terms of the Portland ordinance, which had approved an exchange of plant and property, but had disapproved exclusive service territories. The 1972 Agreement recited:

WHEREAS, [PGE] and [PP & L] wish to provide for the elimination of duplicating electric facilities in [the city of Portland]; and

WHEREAS, the City of Portland, by Ordinance No. 134416, passed April 26, 1972, effective May 26, 1972, consented to the exchange by [PGE] and [PP & L] of certain properties located within the city;

NOW, THEREFORE, in order to implement the elimination of said duplicating facilities and to comply with Ordinance 134416, it is agreed....

1972 Agreement at 1–2.

The 1972 Agreement used the following language to effect the exchange of facilities:

1. *Exchange of Facilities*

(a) [PP & L] shall transfer and convey to [PGE] and [PGE] shall acquire from [PP & L] all of the electric distribution plant, including distribution substations, poles, lines, transformers, meters, related distribution facilities, and all easements necessary for the operation thereof, owned, operated and maintained by [PP & L] in ... the area [in Portland] designated as Parcel C....

(b) [PGE] shall transfer and convey to [PP & L] and [PP & L] shall acquire from [PGE] all of the electric distribution plant, including distribution substations, poles, lines, transformers, meters, related distribution facilities, and all easements necessary for the operation thereof, owned, operated and maintained by [PGE] in the

areas [in Portland] designated as Parcels A and B....

1972 Agreement at 2–3.

The 1972 Agreement was approved by an order of the OPUC issued in December 1972. The 1972 Order provided, in relevant part:

The Commissioner's approval is needed prior to the sale, lease, assignment or other disposition of public utility property pursuant to ORS 757.480....

On July 18, 1972, [PP & L] and [PGE] entered into an agreement whereby an exchange of property and utility facilities would be made between [PGE and PP & L] in the City of Portland.... This exchange ... also involves the transfer of customers from one party to the other.

. . . .

ORDERED that [PP & L] may transfer to [PGE] all electric distribution plant ... situated within or used for providing utility service within the boundaries of Parcel A ... [and] Parcel B....

ORDERED that [PGE] may transfer to [PP & L] all electric distribution plant ... used for providing utility service within the boundaries of [Parcel C]....

. . . .

ORDERED that the manner and method of accomplishing the transfer and exchange of property, facilities and customers, and the terms and conditions governing this transfer, shall be provided by that agreement between the companies herein, dated July 18, 1972.

Pub. Util. Comm'n of Or., Order 72–970 (Dec. 15, 1972) (the "1972 Order").[4]

In approving the exchange of property in the city of Portland, the OPUC did not cite any of the statutory provisions that give the OPUC its authority to approve contracts be-

---

4. The only reference to customer accounts in the 1972 Agreement is in Section 7, which provides in relevant part:

7. *Transfer of Customer Accounts*
The transfer of customer accounts between [PGE] and [PP & L] shall commence on July 24, 1972, and shall be coordinated so that the revenues from the sales of electricity of each company will remain substantially the same over the period required to accomplish transfer of all customers involved....

There is no reference to customer accounts in Section 1 of the 1972 Agreement, which provides for the exchange of facilities. In referring to the transfer of customers, Section 7 does not use the "shall transfer and convey" language used in Section 1. Thus the language and structure of the 1972 Agreement, as well as the language of the 1972 Order quoted in the text, suggest that the transfer of customers was treated as a necessary incident to the exchange of facilities. For a further discussion of the transfer of customers, see *infra* pp. 1456–57.

tween utility companies allocating exclusive service territories. *See* Or.Rev.Stat., ch. 758 ("Utility ... Territory Allocation ...").[5] Unlike the Portland City Council ordinance—which had expressly disapproved exclusive service territories—but like the 1972 Agreement, the 1972 Order said nothing about exclusive service territories in Portland. The OPUC cited as authority for its approval of the 1972 Agreement Chapter 757 of the Oregon Revised Statutes ("Utility Regulation Generally"), specifically Or.Rev. Stat. § 757.480,[6] which gives the OPUC authority to approve the sale, lease, assignment or other disposition of public utility property.

After the OPUC issued its 1972 Order, PGE and PP & L stopped competing with each other in Portland. Each utility served customers exclusively in the parcels in which it had acquired the electric distribution facilities of the other.

Columbia Steel operates a steel casting plant located in the area which PGE began serving exclusively after the issuance of the 1972 Order. In 1987, Columbia Steel asked PP & L to service its plant because PP & L's rates were lower than PGE's. PP & L refused, citing the fact that the plant was located in the territory being served exclusively by PGE.

In 1989, Columbia Steel again asked PP & L to service its casting plant. This time, PP & L agreed and offered to enter into a supply contract with Columbia Steel. PGE objected, however, citing its 1972 Agreement with PP & L. PGE took the position that the 1972 Agreement gave it the exclusive right to service Columbia Steel's plant because it was located in the service territory allegedly "allocated" to PGE by the 1972 Agreement. Undeterred, Columbia Steel wrote PGE on May 30, 1990, asking it to "wheel" electricity generated by PP & L to the casting plant until PP & L could build a substation which would enable it to deliver power directly to the plant. PGE refused, reasserting that it had the exclusive right to service Columbia Steel's plant.

On June 19, 1990, Columbia Steel filed this antitrust action against PGE, PP & L, and the OPUC, on the theory that the division of Portland into exclusive service territories violated the Sherman Act, 15 U.S.C. §§ 1–2.[7] The defendants raised the

---

**5.** Chapter 758 of the Oregon Revised Statutes speaks of "allocated" territories and defines that term in a way that means exclusive service territories. Section 758.400(1) defines "allocated territory" as "an area with boundaries established by a contract between persons furnishing a similar utility service and approved by the commission or established by an order of the commission approving an application for the allocation of territory". Or.Rev.Stat. § 758.400(1). Section 758.410(1) permits "[a]ny person providing a utility service [to] contract with any other person providing a similar utility service for the purpose of allocating territories and customers between the parties and designating which territories and customers are to be served by which of said contracting parties." Or.Rev.Stat. § 758.410(1). Section 758.425 authorizes the OPUC to approve the "contract as filed" and provides that "[i]f the commission approves [the] contract ... the contract shall be deemed to be valid and enforceable...." Or.Rev.Stat. § 758.425. Section 758.450(2) provides that "no other person shall offer, construct or extend utility service in or into an allocated territory." Or. Rev.Stat. § 758.450(2).

**6.** Section 757.480 provides in pertinent part:
 (1) No public utility doing business in Oregon shall, without first obtaining the commission's approval of such transaction:

(a) Sell, lease, assign or otherwise dispose of the whole of the property of such public utility necessary or useful in the performance of its duties to the public or any part thereof of a value in excess of $10,000, or sell, lease, assign or otherwise dispose of any franchise, permit, or right to maintain and operate such public utility or public utility property, or perform any service as a public utility;

 . . .

 (2) Every such sale, lease, assignment, mortgage, disposition, encumbrance, merger or consolidation made other than in accordance with the order of the commission authorizing the same is void.

Or.Rev.Stat. § 757.480.

**7.** An agreement among competitors to allocate territories is a per se violation of § 1 of the Sherman Act. *E.g., Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 402–03, 112 L.Ed.2d 349 (1990); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 378, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1973) (contracts that purported to restrict defendant's ability to wheel power "were 'in reality, territorial allocation schemes,'" and "were *per se* violations of the Sherman Act") (citation omitted).

state-action doctrine as an affirmative defense, contending that the division of the Portland market was cloaked with antitrust immunity by the 1972 Order of the Oregon OPUC approving the 1972 Agreement.

In July 1990, PP & L entered into a contract with Columbia Steel and began servicing the casting plant in July 1991, when PGE began transmitting PP & L's power to the plant over PGE's power line. Columbia Steel later dismissed all its claims against PP & L, which explains why PP & L is not a party to this appeal.

On July 3, 1991, the district court rejected PGE's state-action defense in an order granting Columbia Steel's motion for partial summary judgment. *Pacificorp v. Portland Gen. Elec. Co.,* 770 F.Supp. 562 (D.Or.1991). The district court held that the OPUC's 1972 Order did not articulate a state policy to allocate exclusive service territories in Portland as required by *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). *Pacificorp,* 770 F.Supp. at 569–71. As the district court interpreted the OPUC's 1972 Order, it approved a one-time exchange of property and customer accounts, but not an allocation of exclusive service territories. *Id.* at 570–71.

On February 4, 1993, the district court granted summary judgment for Columbia Steel on the remaining issues, ruling that PGE had violated section 1 of the Sherman Act in agreeing with PP & L not to compete in the Portland market. The court awarded Columbia Steel $508,425 in treble damages and $901,671.62 in attorneys' fees and costs.

## II. State–Action Immunity

### A. The Midcal Clear Articulation Requirement

■ The state-action doctrine cloaks anticompetitive conduct with antitrust immunity only if the state's intent to displace competition with regulation is "clearly articulated and affirmatively expressed as state policy." *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943 (upholding state wine pricing system because "[t]he legislative policy is forthrightly stated and clear in its purpose to permit

resale price maintenance"). The *Midcal* test is a "rigorous" one that "ensure[s] that private parties [can] claim state-action immunity from Sherman Act liability only when their anticompetitive acts [are] truly the product of state regulation." *Patrick v. Burget,* 486 U.S. 94, 100, 108 S.Ct. 1658, 1662, 100 L.Ed.2d 83 (1988). It guarantees that the "private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests," *id.* at 101, 108 S.Ct. at 1663, and limits the spread of an immunity that is "disfavored, much as are repeals [of the antitrust laws] by implication," *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410 (1992), because of Congress's "overarching and fundamental policies" protecting competition, *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 398–99, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978). *See also* Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶ 214e (1978).

■ The district court acknowledged that the provisions of chapter 758 of the Oregon Revised Statutes, which authorize the OPUC to approve contracts between public utilities allocating exclusive service territories, "articulate the policy of the State of Oregon to remove market competition as the basis for determining the customers of the providers of electricity." *Pacificorp,* 770 F.Supp. at 570. As the district court put it:

> To the extent that a public utility provider obtains a lawful and valid contract for the allocation of territories and customers through the provisions of the territorial allocation statutes, [Or.Rev.Stat.] 758.400 to 758.475, that provider is immune from antitrust violations.
>
> . . . .
>
> [Or.Rev.Stat.] 758.400(1) states that " '[a]llocated territory' means an area with boundaries established by a contract between persons furnishing a similar utility service and approved by the commission or established by an order of the commission approving an application for the allocation of territory." In order to lawfully displace competition as the method of allocating customers for electric service in a particular area, utility companies must enter into

a contract which allocates service territories and designates service to customers, and the utility companies must make application to and receive an order from the [O]PUC approving and establishing the allocation of these territories. These requirements must be met in order to receive the immunity which is provided by the state statutory scheme from the federal antitrust laws.

*Id.*

Notwithstanding the clarity with which chapter 758 expresses a legislative policy of authorizing the OPUC to approve allocations of exclusive service territories, the district court rejected PGE's state-action immunity defense because the OPUC failed to exercise that authority in issuing the 1972 Order. *Id.* at 571. The district court explained that the 1972 Agreement between PGE and PP & L, which the 1972 Order approved, did not establish exclusive service territories in the city of Portland. As the district court read the 1972 Agreement, PGE and PP & L had agreed "only to an exchange of facilities within the area relevant to this action." *Id.* at 571. In other words, the state did not approve the displacement of competition with territorial monopolies in the Portland market with the clarity required by *Midcal.*

■ We agree with the district court that the 1972 Order fails to speak with sufficient clarity to satisfy the *Midcal* test.[8] Neither the 1972 Order nor the 1972 Agreement it approved says anything about exclusive service territories in the city of Portland. This omission becomes glaring when the language of the 1972 Order as it pertained to Portland is compared with the language of the same order as it pertained to the city of Rainier. Although the 1972 Order said nothing about exclusive service territories in approving the exchange of property in Portland, it expressly used such language in approving a provision of the 1972 Agreement which transferred to PGE an area within the city of Rainier that had previously been served exclusively by PP & L. See 1972 Order at 8 ("ORDERED that the application of [PP & L] to transfer certain of its *exclusively served area allocated to it and lying in and around Rainier, Oregon,* to [PGE] is approved.") (emphasis added). The contrast between the "transfer and exchanging of utility property and facilities and customers" language used in the 1972 Order to describe the utilities' agreement with respect to the city of Portland, 1972 Order at 8, and the "exclusively served territory" language used in the 1972 Order to describe the utilities' agreement

---

**8.** PGE argues that the clear articulation prong of the *Midcal* is satisfied because Or.Rev.Stat. §§ 758.400—758.450 "encourage exactly the kind of division that PGE and PP & L carried out," and that whether or not the OPUC clearly authorized PGE's challenged conduct is relevant only to the active supervision prong of *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943 (state action immunity only applies if the state actively supervises the challenged anticompetitive conduct). Resp. of Portland General Elec. Co. to Appellant's Pet. for Reh'g and Amicus Brief of United States at 18. In making this argument, PGE relies on *Praxair, Inc. v. Florida Power & Light Co.,* 64 F.3d 609, 612 (11th Cir.1995) ("If [the defendant engaged in anticompetitive conduct] presumably because of a territorial agreement, but the area in question was never approved by the Commission, the [defendant's] action would not merit state action immunity because of the lack of 'active state supervision.' ") (quoting *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1678, 134 L.Ed.2d 781 (1996).

*Praxair* does not help PGE. As the Court explained in *Ticor,* the case on which *Praxair* relies,

"*Midcal*'s two elements ... [are both] directed at ensuring that particular anticompetitive mechanisms operate because of a deliberate and intended state policy." *Ticor,* 504 U.S. at 636, 112 S.Ct. at 2178. *Praxair* is nothing more than a fact specific application of the *Midcal* test. The anticompetitive conduct had been authorized by a Florida Public Service Commission order approving an allocation of service territories, and the Eleventh Circuit merely held that the order was intended to include a particular county in the exclusive service territories created. *See Praxair,* 64 F.3d at 613. Since the Oregon statute speaks solely of authorizing the OPUC to approve exclusive service territories, the state's clearly articulated policy is to have the OPUC decide whether to sanction anticompetitive conduct. It follows, therefore, that we must look to the decisions of the OPUC to determine whether PGE's conduct was part of a clearly articulated state policy. *Cf. Ticor,* 504 U.S. at 636–37, 112 S.Ct. at 2178–79 (first prong of *Midcal* test intended to ensure state has not acted through inadvertence).

with respect to the Rainier area, *id.,* is striking.

Like the part of the 1972 Order relating to Rainier, the ordinance passed by the Portland City Council earlier in 1972 also referred to exclusive service territories. It did so, however, in disapproving, not approving, the elimination of competition in favor of a territorial division between PGE and PP & L. The ordinance reminded the utilities that they "operate under non-exclusive franchises and that the obligation to supply properties within the City must remain binding upon both companies." Portland, Or., Ordinance 134416 (1972).

Our second reason for agreeing with the district court is that in approving the exchange of property in Portland, the 1972 Order does not cite any of the statutory provisions governing the allocation of exclusive service territories. Rather than citing chapter 758 or any of its provisions, the OPUC cited a provision of chapter 757, the chapter governing "Utility Regulation Generally," specifically Or.Rev.Stat. § 757.480, which authorizes the approval of exchanges of utility facilities. We are struck by the precision and care with which the OPUC cited various statutory provisions in issuing the 1972 Order. As authority for approving the transfer to PGE of the exclusively served territory in Rainier previously allocated to PP & L, the OPUC cited the statutory provision governing transfers of previously allocated service territories (Or.Rev.Stat. § 758.460 [9]). It did not cite any section of chapter 758 in approving the provisions of the 1972 Agreement relating to Portland.[10]

As authority for approving the exchange of facilities in Portland, the OPUC cited only the statutory provision governing transfers of utility facilities (Or.Rev.Stat. § 757.480).

In sum, the OPUC did not "forthrightly state[ ]" a policy of the state of Oregon that was "clear in its purpose" to displace competition in the Portland market with territorial monopolies.[11] *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943.

The OPUC argues that, despite the failure of the 1972 Order to say anything about exclusive service territories in the city of Portland, the Order nonetheless immunized the division of the Portland market because the "statutory import of the 1972 Order was necessarily an allocation of service territory in the City of Portland as between PGE and PP & L." Opening Brief of Pub. Util. Comm'n of Or. at 9. The OPUC asserts that the 1972 Agreement "effectively" allocated exclusive service territories because "[e]xchanging customers is logically the only way to reallocate established service territory into exclusive zones." *Id.* at 9–10. The OPUC adds that "[t]he only way that the OPUC could lawfully have approved the transfer of customers between existing utilities was under the authority of the territorial allocation statutes." *Id.* at 10. *See also* Resp. of Portland General Elec. Co. to Appellant's Pet. for Reh'g and Amicus Brief of United States at 7 ("The allocation statutes speak of the allocation of 'territories and *customers.*' The 1972 Agreement and the 1972 Order explicitly allocate *customers,* whether they explicitly al-

---

**9.** Section 758.460 provides in relevant part:

(1) The rights acquired by an allocation of territory may only be assigned or transferred with the approval of the commission after a finding that such assignment or transfer is not contrary to the public interest. Or.Rev.Stat. § 758.460.

**10.** In particular, there is no reference in the 1972 Order to Or.Rev.Stat. § 758.410, which permits utilities to contract with each other "for the purpose of allocating territories and customers between the parties." Nor is there any reference to § 758.425, which gives the OPUC its authority to approve such contracts, even though an exclusive service territory can be established only "by a contract between persons furnishing a

similar utility service and approved by the commission or ... by an order of the commission approving an application for the allocation of territory." Or.Rev.Stat. § 758.400(1) (defining "allocated territory").

**11.** Columbia Steel argues that PGE and PP & L intentionally introduced ambiguity into the 1972 Agreement in order to slip a monopolistic agreement past the city of Portland. We need not address this argument because, whether or not ambiguity was introduced into the contract for the self-serving purpose of making it less politically vulnerable, the utilities' failure to include the "exclusively served" language in the 1972 Agreement that had been included in the plan submitted to the City Council certainly had the *effect* of creating ambiguity in the 1972 Order.

locate territories or not.") (citation omitted) (emphasis in original).

In response, Columbia Steel argues that nothing in the relevant statutory provisions rules out a one-time exchange of customers as an incident of an exchange of facilities without the establishment of permanent territorial monopolies. According to Columbia Steel, such a one-time exchange of customers is a practical consequence of an exchange of facilities:

> When, as in this case, a utility sells the power line that distributes electricity directly to a customer, it makes sense that the account of the customer served by that line would be transferred to the new owner of the line. Thus, the transfer of customer accounts was only an incident of the transfer of utility property. It is the practical consequence of a transfer of facilities, but it is not the perpetual grant of monopoly power. As a practical matter, unless another source of electricity is available, the customer will take service from the utility that owns the facilities connected to that customer's premises. But the utility serves that customer because it is practical to do so, not because the utility has an exclusive right to serve that customer.

Pet. for Reh'g at 13–14.

Columbia Steel's argument has considerable force. It is buttressed by the fact that PP & L was able to take a good customer away from PGE simply by building a substation in PGE's "territory" to transmit power to Columbia Steel's plant at rates that were more competitive than PGE's. Thus, although the transfer of facilities, and the transfer of customers incidental thereto, gave each utility a temporary competitive advantage, it did not immunize them from competition forevermore. That PGE's advantage proved to be transitory is not surprising given the competitive pressures that technology and deregulation have been exerting on utility markets where monopolies have traditionally reigned.

In any case, we need not resolve the dispute over whether, as the OPUC argues, an exchange of customer accounts is, as a practical matter, the factual equivalent of an allocation of exclusive service territories. Even if this were the case, it would merely be evidence that might tend to support a permissive inference that the OPUC intended to approve a displacement of competition in Portland with monopolies, and any such inference could not transform the 1972 Order into the forthright and clear statement that it takes to satisfy *Midcal*'s stringent requirements.

PGE and the OPUC also argue that the OPUC's failure to cite any provision of chapter 758 as authority for the 1972 Order as it pertains to Portland renders the 1972 Order nothing more than an "imperfect regulation" which may still confer state-action immunity, citing *Llewellyn v. Crothers,* 765 F.2d 769, 774 (9th Cir.1985) ("actions otherwise immune should not forfeit that protection merely because the state's attempted exercise of its power is imperfect in execution under its own law").

PGE and the OPUC's reliance on *Llewellyn* is misplaced. In *Llewellyn,* the administrator of a state agency promulgated a fee schedule for health care providers, as he was authorized to do under state statute, but bypassed statutory rulemaking procedures. We held that although the administrator had acted in a "procedurally improper manner," the state government was nonetheless entitled to state-action immunity. *Id.* at 773. *Llewellyn* is inapposite here. There the state legislature had clearly articulated an intention to authorize the administrator to promulgate a fee schedule, and the administrator had exercised that authority in clearly articulating his intent to adopt such a fee schedule, notwithstanding that he did not follow the required rulemaking procedures of the state's Administrative Procedure Act. *Id.* at 772. In contrast, the OPUC did not clearly exercise its statutory authority to approve the allocation of exclusive service territories in Portland; indeed, it did not speak to the issue at all. So rather than exercising its authority "imperfectly," the OPUC failed altogether to exercise its authority to approve exclusive service territories with any clarity whatsoever.

Finally, PGE and the OPUC argue that even if the 1972 Order did not clearly autho-

rize an allocation of exclusive service territories within the city of Portland, later orders issued by the OPUC clarify the 1972 Order. In particular, the PGE and the OPUC rely upon a 1974 Order of the OPUC, which, they assert, confirmed that the 1972 Order did, in fact, confer state-action immunity.[12]

None of the OPUC orders relied on by PGE establishes state-action immunity. First, to the extent that there is language in the orders relevant to the division of the Portland market, it merely recognizes the undisputed fact that PGE and PP & L had stopped competing with each other in that city.[13] For instance, the 1974 Order, on which PGE relies most heavily, states that PGE and PP & L "no longer competitively serve the same areas. Their respective areas of service within Portland have been defined." Pub. Util. Comm'n of Or., Order 74–658 (Sept. 3, 1974), *aff'd sub nom. American Can Co. v. Davis,* 28 Or.App. 207, 559 P.2d 898 (1977) (the "1974 Order"), at 25; *see also* Pub. Util. Comm'n of Or., Order 75–704 (Aug. 13, 1975) (noting that PP & L serves customers "in parts of Portland"). That language is merely a description of the status quo; it is not an expression of a state policy to replace competition with regulation. Although the quoted language might tend to support a permissive inference that the commissioners in 1974 thought that the commissioners in 1972 had defined exclusive service territories in Portland when they issued the 1972 Order, the OPUC can not confer state-action immunity by forming an intent that is not expressed forthrightly and clearly.

Second, the "respective areas of service" language in the 1974 Order, as well as the language in the other OPUC orders stating that PGE and PP & L had stopped competing in Portland, cannot be construed as a product of the OPUC's exercise of its statutory authority to approve contracts allocating exclusive service territories. Because there were no such contracts before the OPUC when it issued these later orders, the orders were not issued pursuant to the provisions of Or.Rev.Stat. ch. 758 authorizing approval of such contracts. The 1974 Order, for example, was issued pursuant to Or.Rev.Stat. §§ 757.205, 757.210, and 757.215, which pertain to changes in tariffs charged by utilities. The 1974 Order approved PP & L's revised tariff schedule, which equalized PP & L's rates in Portland with the higher rates it charged in other areas of the state. As a result, PP & L's rates for customers in Portland became higher than the rates charged by PGE. The "respective areas of service" language in the 1974 Order was recited merely to establish a rationale for the OPUC's action approving the new rates:

> A rate differential between Portland and [other areas] was formerly justified on the basis of competing electric service in Portland between [PP & L] and [PGE]. For various reasons, it was believed that in the Portland metropolitan area rates between two similar utilities serving the same area should be the same.
>
> The two companies no longer competitively serve the same areas. Their respective areas of service within Portland have been defined. Thus, with the lack of competition, the justification for rate uniformity is said to have disappeared.

1974 Order at 25.

■ As a matter of law, then, neither the 1974 Order nor any of the other subsequent orders of the OPUC amend the 1972 Order to clarify that Order as an expression of state policy to displace competition with regulation. At best, these orders recite that the utilities have stopped competing with each other within territories they have defined. As our court has said, mere "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Phonetele, Inc. v. American Tel. & Tel. Co.,* 664 F.2d 716, 736 (9th Cir.1981) (quoting *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 592–93, 96 S.Ct. 3110,

---

12. PGE also cites Pub. Util. Comm'n of Or., Orders 73–688 (Oct. 25, 1973), 75–704 (Aug. 13, 1975), and 79–055 (Jan. 12, 1979).

13. As Columbia Steel puts it, "[w]hether, as a matter of fact, the utilities competed is an entire-

ly different inquiry from whether, as a matter of law, the utilities secured lawful allocations of exclusive service territory." Columbia Steel Reply Brief at 11.

3118–19, 49 L.Ed.2d 1141 (1976)), *cert. denied,* 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983).

In sum, we agree with the district court that the elimination of competition between PGE and PP & L in Portland was not cloaked with state-action immunity. As the district court put it, the OPUC did not "specifically and clearly authorize[ ] by the relevant statutory process" a division of the Portland market into exclusively served territories. *Pacificorp,* 770 F.Supp. at 571.

### B. Issue Preclusion

After Columbia Steel filed this antitrust action in federal district court, PGE applied to the OPUC for a declaration that the 1972 Order allocated exclusive service territories in Portland. In response, the 1992 OPUC issued an order declaring that the 1972 OPUC had intended to do so, and amended the 1972 Order, *nunc pro tunc,* to that effect. In its 1992 Order, the OPUC acknowledged that "perhaps [the 1972 Order] did not unambiguously allocate exclusive service territories to PGE and PP & L." Pub. Util. Comm'n of Or., Order 92–557 (Apr. 16, 1992) (the "1992 Order"), at 14.[14]

**14.** The 1992 Order states, in relevant part:
[B]ecause [the 1972 Order] did not expressly refer to ORS Chapter 758 with respect to future service in Portland under the allocation statutes and because the order did not say that exclusive territorial allocations are being created in Portland, ... perhaps it did not unambiguously allocate exclusive service territories to PGE and PP & L. However, the order did create boundaries that the utilities observed as if they were allocated territories until Columbia Steel's attempt to switch utilities in 1989. The Commission made the required statutory findings to allocate exclusive service territories and acted as if it had approved a territorial allocation in its 1972 order. The behavior of the utilities and the Commission demonstrates an understanding that exclusive service territories had been created.
For the foregoing reasons, it appears to the Commission that [the 1972 Order] is not a complete and accurate memorial of the 1972 decision of the Commissioner ...: the order omits a reference to the statute under which its findings were actually made when the Commissioner approved the PGE/PP & L contract. Pursuant to ORS 756.568, the Commission will amend [the 1972 Order], nunc pro tunc, to

Armed with the OPUC's 1992 Order, PGE moved for reconsideration of the district court's summary judgment rulings in favor of Columbia Steel, arguing that the OPUC's 1992 Order was entitled to full faith and credit. The district court denied the motion, reasoning that:
[t]he availability of the defense of state action immunity depends upon the satisfaction of the objective standards set forth in *Parker* [*v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) ] and the authorities which have interpreted *Parker.* ...
The fact that the [O]PUC did not do what it now concludes that it intended to do in the 1972 Order does not alter the fact that the claim of PGE to a monopoly was not specifically and clearly authorized at the time that this court decided that Columbia Steel was entitled to a declaration that [the 1972 Order] neither empowers nor authorizes PGE to monopolize the service of electric power to Columbia Steel.

Unpublished Opinion, filed June 29, 1992, at 7–9.

We agree and hold that the 1992 Order is not entitled to preclusive effect because the issue decided by the OPUC in that order is not identical to the state-action immunity issue.[15] The issue decided by the

conform to the actual decision intended and followed.
1992 Order at 14–15.

**15.** Oregon law provides that one tribunal may give preclusive effect to the prior determination of an issue by another tribunal only if "the issue in the two proceedings is identical." *Hickey v. Settlemier,* 318 Or. 196, 864 P.2d 372, 375 (1993).
Oregon law also provides that the second tribunal may give preclusive effect to an earlier decision only if "the party sought to be precluded has had a full and fair opportunity to be heard on that issue." *Id.* Columbia Steel argues that it was not given such an opportunity before the OPUC issued the 1992 Order. Columbia Steel denies having waived its right to a hearing on the merits, pointing to record evidence that it only agreed to postpone the submission of evidence to the OPUC until the OPUC ruled on Columbia Steel's motion to dismiss for lack of jurisdiction. We need not decide whether Columbia Steel was denied a fair opportunity to be heard in the proceeding before the OPUC because, as we explain in the text, the issue in that procedure is not "identical" to the issue of state-action immunity in this federal antitrust action. *Id.*

1992 OPUC is whether the 1972 OPUC had the intent to approve the allocation of exclusive service territories in the city of Portland. The state-action immunity issue is different. It does not turn on the fact issue of the subjective intent of the OPUC at the time it issued the 1972 Order. Rather, the state-action immunity question is one of law that turns on whether the displacement of competition with monopolies in the Portland market was "clearly articulated and affirmatively expressed as state policy," *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943. As the district court said, "the availability of the defense of state-action immunity depends upon the satisfaction of the objective standards set forth in *Parker* [and its progeny]." Unpublished Opinion, filed June 29, 1992, at 7–8. In other words, state-action immunity is a question of federal antitrust law that turns on the clarity of a state's expression of its policy, not the subjective intent of its policymakers.

■ In declaring what the 1972 OPUC intended to do, the 1992 OPUC approached the 1972 Order as though it were interpreting a contract. After finding ambiguity in the 1972 Order, the 1992 OPUC went on to decide, as an issue of fact, the intent of the 1972 OPUC by looking to extrinsic evidence such as the behavior of the parties between 1972 and 1990. *See* 1992 Order at 12–15. To repeat, state-action immunity is not an issue of fact. It cannot be decided simply by ferreting out extrinsic evidence in an effort to ascertain the subjective intent of the state.

The issue of state-action immunity must be decided by applying the "rigorous" test, *Patrick*, 486 U.S. at 100, 108 S.Ct. at 1662–63, of whether the state "clearly articulated and affirmatively expressed" its intent to displace competition with regulation as a matter of state policy. *Midcal* 445 U.S. at 105, 100 S.Ct. at 943.[16]

■ In sum, the 1992 OPUC could not satisfy the *Midcal* test retroactively by amending the 1972 Order years after PGE entered into the monopolistic agreement it now seeks to cloak with federal antitrust immunity.[17] In other words, the state of Oregon cannot satisfy the objective *Midcal* clear articulation test by declaring that it had intended to displace competition with regulation 20 years earlier.[18]

### C. Foreseeability: PGE's New Argument on Appeal

■ PGE, joined by the OPUC, argues for the first time on appeal that state-action immunity applies because the division of the Portland market was a foreseeable result of the 1972 Order. According to PGE, "state action immunity must apply where the [challenged] conduct is the 'foreseeable result' of the state's policy." Opening Brief of Appellant Portland General Elec. Co. at 23 (citing *Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429 (9th Cir.1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2336, 124

---

**16.** For the same reason, there can be no issue preclusion based on the judgment of the Marion County Court affirming the 1992 Order on the ground that the it was "supported by substantial evidence." *See Columbia Steel Casting Co. v. Public Util. Comm'n of Or.*, Marion County Circuit Court No. 92C–12005, Judgment affirming Public Utility Commission of Oregon Order Nos. 92–557 & 92–1135, at 2, *aff'd without opinion,* Oregon Ct. of Appeals (Dec. 15, 1993).

**17.** It is fundamental that an order or judgment is not entitled to full faith and credit if the issuing tribunal had no subject matter jurisdiction over the matter before it. *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n,* 455 U.S. 691, 704–05, 102 S.Ct. 1357, 1365–66, 71 L.Ed.2d 558 (1982). We do not know whether the OPUC and the Marion County Court had subject matter jurisdiction as a matter of state law to amend the 1972 Order retroactively. We believe, however, that it

is questionable whether either had subject matter jurisdiction to decide the federal antitrust question of state-action immunity that is now before us. We need not decide this jurisdictional question because the lack of identity between the issue decided in the 1992 Order and the issue of state-action immunity deprives the 1992 Order of any preclusive effect in this federal antitrust action.

**18.** PGE's reliance on *California Aviation, Inc. v. City of Santa Monica,* 806 F.2d 905 (9th Cir. 1986), and the cases on which it relies, for the proposition that *Midcal* can be satisfied retroactively is misplaced. In *California Aviation*, the later statute "articulate[d] and affirm[ed] a *pre-existing state policy* of allowing [particular anticompetitive conduct]." *Id.* at 909 (emphasis added). In contrast, there was no pre-existing state policy to eliminate competition in the Portland market for the OPUC to articulate or affirm in its 1992 Order.

L.Ed.2d 247 (1993)). "We will review an issue that has been raised for the first time on appeal under certain narrow circumstances," including "when the issue is purely one of law." *Parks Sch. of Business v. Symington*, 51 F.3d 1480, 1488 (9th Cir.1995). Because the foreseeability issue raised by PGE and the OPUC is a pure issue of law, and because consideration of it will not prejudice Columbia Steel, *see Aronson v. Resolution Trust Corp.*, 38 F.3d 1110, 1114 (9th Cir.1994), we exercise our discretion to consider it.

In our original opinion, we agreed with PGE. We held that "[u]nder [*Nugget* and *Medic Air Corp. v. Air Ambulance Auth.*, 843 F.2d 1187 (9th Cir.1988)], private conduct is immunized if it is a foreseeable result of state agency action and if circumstances justify an inference that the agency intended to authorize the conduct." *Columbia Steel Casting Co. v. Portland General Elec. Co.*, 60 F.3d 1390, 1396 (9th Cir.1995), *herewith withdrawn.* Although we said that "the 1972 Order is not particularly clear regarding the [O]PUC's intention to permit a permanent division of the Portland market, as opposed to a one-time exchange of facilities and customer accounts," *id.* at 1396, we nonetheless "conclude[d] that the elimination of competition between PGE and PP & L was a natural and foreseeable result of the 1972 Order," *id.* at 1399, "justify[ing] the inference that it was intended by the [OPUC]." *Id.* Accordingly, we held that PGE's conduct enjoyed state-action immunity from Sherman Act liability.

We are persuaded by Columbia Steel's petition for rehearing and an amicus curiae brief filed by the Antitrust Division of the Department of Justice that we erred in allowing a foreseeability test to be substituted for the clear articulation test of *Midcal.* In doing so, we misconstrued *Medic Air* and *Nugget.* In *Medic Air,* we used *Midcal's* clear articulation test, not a foreseeability test, in deciding that state-action immunity shielded a monopoly granted to Air Ambulance Authority in the market of dispatching air ambulances in Washoe County, Nevada. 843 F.2d at 1189. We did use a foreseeability test in *Medic Air,* but only in deciding the reach of the antitrust immunity that protect-

ed Air Ambulance Authority's monopoly in the dispatching market. Specifically, we held that Air Ambulance Authority was not shielded from antitrust liability in using its immunized monopoly power to gain a competitive advantage in a different market, the market for air ambulance services. *Id.* We reasoned that Air Ambulance Authority's antitrust immunity in the dispatching market did not extend to the ambulance service market because anticompetitive conduct in the service market was "not a 'necessary or reasonable consequence' of the decision to establish an exclusive dispatcher." *Id.* (citation omitted). As we explained, "[t]he state and its agencies have not granted Air Ambulance an exclusive [ambulance service] franchise. That they might have done so is irrelevant. The state must act if immunity is to exist.... The Protocols [governing dispatching procedures] did not interfere with existing competition. The District Board did not seek to displace competition or limit entry into the ambulance market. The District Board did not even consider the dispatch program's effect upon competition." *Id.*

The anticompetitive conduct at issue in *Nugget* was also expressly authorized by state action independently of any foreseeability inquiry. A California statute authorized the California Public Utility Commission to "'specify the prices, terms, and conditions' for the sale of power by a private power producer like Nugget to a utility." 981 F.2d at 434 (quoting statute). In exercising that statutory authority, the California PUC clearly expressed an intention to regulate such sales in detail. The California PUC's implementing Guidelines provided that private power producers would "generally bear the risk of failing to develop their power facility before the five year deadline and that only rarely will permitting delays qualify as *force majeur* events." *Id.* The Guidelines specified that a utility was "'expect[ed] ... [to] negotiate [*force majeur* claims] only in instances where it is convinced that a settlement, versus adjudication, is in the ratepayers' best interest.'" *Id.* (quoting Guidelines). We held in *Nugget* that state-action immunity extended to the anticompetitive effects of a utility's rejection of a private power supplier's *force majeur* claim for an extension of

the contract period because the anticompetitive effects were a foreseeable result of the California PUC's implementing Guidelines. *Id.*

Our rejection of PGE's argument that it is entitled to state-action immunity because the division of the Portland market was a foreseeable result of the 1972 Order is consistent with *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), upon which we relied in *Nugget.* The issue in *Town of Hallie* was whether the city's anticompetitive activities were protected by state-action immunity "when the activities are *authorized,* but not compelled, by the State." *Id.* at 36, 105 S.Ct. at 1715 (emphasis added). The Supreme Court held that the challenged action of the city was protected by the state-action immunity doctrine because the city's conduct was "a foreseeable result of empowering the City to refuse to serve unannexed areas." *Id.* at 42, 105 S.Ct. at 1718. However, the Court held that this result was foreseeable because the state expressly authorized the city's anticompetitive behavior. *See id.* In contrast, the OPUC did not expressly authorize PGE to maintain an exclusive service territory; it merely approved the exchange of property and customers.

■ In sum, neither *Medic Air* nor *Nugget* applies a foreseeability test as a substitute for the threshold *Midcal* clear articulation test. As the Antitrust Division puts it, "express authorization [is] the necessary predicate for the Supreme Court's foreseeability test." Brief of Amicus Curiae United States at 9. PGE cites no case to the contrary and we know of none.

### III. PGE's Other Defenses

■ In the absence of state-action immunity, an agreement between PGE and PP & L to divide the Portland market for electricity constitutes a per se violation of § 1 of the Sherman Act. *See, e.g., Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 402–03, 112 L.Ed.2d 349 (1990) (agreement among competitors to allocate territories to diminish competition is a per se § 1 violation). There is no genuine issue of material fact regarding the existence of such an

agreement that would prevent the entry of summary judgment against PGE on liability. *See Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996). We therefore address PGE's affirmative defenses other than state-action immunity. Although the district court found only one of these defenses worthy of discussion, we discuss each of them in turn.

### A. *Statute of Limitations*

■ PGE argues that Columbia Steel's antitrust action, which was filed on June 19, 1990, is time-barred because it was filed four years after any overt act in furtherance of PGE and PP & L's agreement to divide the Portland market. *See* 15 U.S.C. § 15(b) (establishing 4–year limitations period for Sherman Act violations); *Pace Indus., Inc. v. Three Phoenix Co.,* 813 F.2d 234, 237 (9th Cir.1987) ("even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act"). PGE argues that the acts relied upon by the district court in finding Columbia Steel's antitrust claims timely were insufficient to restart the running of the statute because they were merely "reaffirmations" of the original 1972 Agreement to divide the Portland market. *See id.* at 238.

On May 30, 1990, Columbia Steel wrote to PGE and stated that it would terminate its contract with PGE and take power from PP & L as of July 1, 1990, if PGE would agree to wheel power for PP & L so it could serve Columbia Steel's casting plant. PGE said no, declaring in a letter dated May 30, 1990, that "[Columbia Steel] is within PGE's exclusive territory. If it desires to purchase electricity, it must do so from PGE." The district court held that PGE's refusal to wheel PP & L's electricity to Columbia Steel's casting plant was an overt act that restarted the statute of limitations.

We agree with the district court. PGE's refusal was not a mere reaffirmation of PGE and PP & L's 1972 Agreement to stop competing in the Portland market because the 1972 Agreement was not a permanent and final decision that controlled the later act.

*See Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300–01 (9th Cir.) (limitations period restarted each time tour guides shepherded tourists away from plaintiff's souvenir shop in furtherance of antitrust conspiracy between tour operators and other vendors) (quoting and distinguishing *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir.), *cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979), in which later acts were mere affirmations of earlier " 'irrevocable, immutable, permanent and final' decisions" that "completely and permanently excluded [plaintiff] from the market"), *cert. denied*, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986).[19] *Hennegan* also distinguishes *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936 (9th Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981), the only Ninth Circuit case other than *Multidistrict Air Pollution* that is cited by PGE on the statute of limitations issue, on the same ground. *Hennegan*, 787 F.2d at 1301–02.

### B. Justification defenses

 PGE asserts that the 1972 Order required it to stop competing with PP & L in the city of Portland, and that "had PGE failed to conform to the commands of the OPUC ... it could have subjected itself to treble damages for violation of Oregon utility law." Opening Brief of Appellant Portland Gen. Elec. Co. at 29. PGE argues that as a result it is entitled to raise a regulatory justification defense, *see Phonetele, Inc. v. American Tel. & Tel. Co.*, 664 F.2d 716, 737–38 (9th Cir.1981) (no antitrust liability when defendant reasonably concludes that its actions are *necessitated* by concrete factual imperatives recognized as legitimate by the regulatory authority), *cert. denied*, 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983), and a business justification defense, *see, e.g., City of Anaheim v. Southern Cal. Edison*, 955 F.2d 1373, 1381 (9th Cir.1992) (utility not liable for using high-powered transmission

line to the exclusion of competitors in order to keep rates low).

These justification defenses are not available to PGE. When it stopped competing with PP & L in Portland after the 1972 Order issued, it was under no compulsion to do so because the 1972 Order did not approve the allocation of exclusive service territories. Had the 1972 Order done so, a justification defense would arguably have been available to PGE because the Oregon statutes provide that only the utility that has been allocated a territory may serve that territory. *See* Or.Rev.Stat. § 758. 450(2) ("Except [under circumstances not relevant here], no other person shall offer, construct or extend utility service in or into an allocated territory."). In light of this provision, it is significant that in approving an exchange of facilities, the 1972 Order used *permissive* language. *See* 1972 Order at 8–9 ("ORDERED that [PP & L] *may* transfer to [PGE] all electric distribution plant ... that [PGE] *may* transfer to [PP & L] all electric distribution plant ... that the manner and method for accomplishing the transfer and exchange of property ... and the terms and conditions governing this transfer, shall be as provided by [the 1972 Agreement]") (emphasis added). Because the language of the 1972 Order was permissive, it did not require PGE and PP & L to perform the 1972 Agreement and did not prevent them from rescinding it before the property was exchanged. Given the statutory prohibition against serving a territory allocated to another utility, *see* Or.Rev.Stat. § 758.450(2), the permissive language in the 1972 Order would have been incongruous if the 1972 Order had approved an allocation of exclusive service territories.

### C. The Noerr–Pennington Doctrine

 PGE argues that it is entitled to antitrust immunity under the *Noerr–Pennington* doctrine. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d

---

**19.** Columbia Steel also argues that the refusal in 1987 of PGE's coconspirator PP & L to service the steel casting plant over the objection of PGE was also an overt act that restarted the statute of limitations. We need not consider the significance of the events in 1987 to the statute of

limitations question because we hold that the statutory period was restarted in 1990. The 1987 events are, however, relevant to Columbia Steel's cross-appeal regarding damages, which we address in Part V, *infra*.

464 (1961) (the Sherman Act does not prohibit competitors from "associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly"); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). The *Noerr–Pennington* doctrine, which is rooted in the First Amendment protection of political activity, *see Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 1414–15, 8 L.Ed.2d 777 (1962), does not apply here. Applying to an administrative agency for approval of an anticompetitive contract is not lobbying activity within the meaning of the *Noerr–Pennington* doctrine. In any case, PGE is not being held liable for filing the application that resulted in the 1972 Order. PGE is being held liable for agreeing with PP & L to replace competition with area monopolies in the Portland market.

### D. The Filed Rate Doctrine

■ PGE argues that the filed rate doctrine bars Columbia Steel from recovering damages even if PGE did violate the Sherman Act. The filed rate doctrine generally forbids the recovery of treble damages under the Sherman Act based on the payment of rates that are established by regulated tariffs, even if the defendants engaged in illegal price-fixing. *See, e.g., Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 162, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922). According to PGE, the filed rate doctrine applies in this case as follows: (1) Because PGE could charge only the rates approved by the OPUC, it could not charge the same rate offered by PP & L to Columbia Steel; (2) PGE could not "transfer" its customer Columbia Steel to PP & L without OPUC approval; (3) thus, the district court could not award damages based on the difference between the rate charged by PGE and the "rate that might have been approved absent the conduct at issue." Opening Brief of Appellant Portland General Electric Co. at 32.

We reject PGE's reasoning. The conduct challenged in this case is not PGE's refusal to sell electricity to Columbia Steel at a lower rate. Rather, the challenged conduct is the non-competition agreement that prevented Columbia Steel from buying electricity at PP & L's lower rates. The filed rate doctrine is inapplicable. To hold that it is applicable would be to "allow a blockade of a competitor to escape scrutiny. This would overextend *Keogh*'s reach and could produce a rule that one who pays for services governed by [a regulatory body's] tariffs is foreclosed from asserting that antitrust violations prevented use of a less expensive, equivalent service." *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1159 (3d Cir.1993).

### IV. Damages

■ PGE argues that Columbia Steel suffered no damages at any time because (1) at all relevant times, Columbia Steel was obligated on its requirements contract with PGE to purchase electricity from PGE, and (2) PGE could not transfer Columbia Steel as a customer to PP & L without prior OPUC approval. These arguments are to no avail. First, Columbia Steel's requirements contract with PGE did not bar it from suing PGE under the Sherman Act for agreeing with PP & L to stop competing in the Portland market. *See, e.g., Perma Life Mufflers v. International Parts Corp.,* 392 U.S. 134, 139–40, 88 S.Ct. 1981, 1984–85, 20 L.Ed.2d 982 (1968) (franchise agreement does not defeat franchisee's standing to bring antitrust suit against franchisor); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 377 F.2d 776, 781 (3d Cir.1967) ("captive customer" having valid lease agreement with defendant for use of certain equipment could nonetheless sue for antitrust violation based on defendant's refusal to sell the equipment), *aff'd on other grounds,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

As for PGE's second argument, the only authority it cites is the 1972 Order stating that "[t]here can be no question that the Commissioner has regulatory approval over any such transfers or exchanges of customers," 1972 Order at 6. However, when read in context, this statement refers only to the joint application by PGE and PP & L for the transfer of tens of thousands of customers *without the customers' permission.* It has

no application, therefore, to Columbia Steel's request to be transferred, as a customer, from PGE to PP & L. In the absence of any further analysis or authority for PGE's argument that OPUC approval was necessary for Columbia Steel to become a customer of PP & L, we cannot hold that it has any merit.

## V. Columbia Steel's Cross–Appeal on Damages

Columbia Steel argued to the district court, and now argues on its cross-appeal, that it was entitled to damages beginning with PP & L's refusal in 1987 to sell Columbia Steel power at its lower rates. The district court rejected this argument, stating that "Columbia Steel cannot recover damages from PGE for actions taken or not taken by PP & L. Even where officials of PP & L contacted officials of PGE and discussed the request for service, the refusal of service was an act by PP & L and not an act by PGE." Unpublished Opinion, filed Feb. 5, 1993, at 24. The district court therefore limited recovery of damages to the period from July 1990, when Columbia Steel entered into a contract with PP & L and was thus "willing and able to actually purchase power at a lower rate from PP & L," and July 1991, when PGE began wheeling PP & L's power to Columbia Steel over PGE's transmission lines. *Id.* at 25.

We agree with Columbia Steel that the district court erred in not awarding damages beginning in 1987. The district court mistakenly held that PGE could not be liable for PP & L's refusal to sell power to Columbia Steel in 1987. PP & L was a coconspirator in 1987, and PGE is liable for the acts of PP & L in furtherance of their conspiracy not to compete in Portland. *See Beltz Travel Serv., Inc. v. International Air Transport Ass'n,* 620 F.2d 1360, 1367 (9th Cir.1980) ("If [plaintiff] can establish the existence of a conspiracy in violation of the antitrust laws and that [defendants] were a part of such a conspiracy, [defendants] will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of [defendants'] own actions.").

## VI. Conclusion

The partial summary judgment holding PGE liable to Columbia Steel under § 1 of the Sherman Act is **AFFIRMED.** The partial summary judgment awarding Columbia Steel $508,425 in treble damages is **VACATED** and the case is remanded to the district court for a redetermination of Columbia Steel's damages in accordance with this opinion. Columbia Steel's motion for attorney's fees on appeal pursuant to 15 U.S.C. § 15 is **GRANTED.** The amount of the fees shall be determined by the district court.